**MARY KAY INC., Appellant and Cross–Appellee,**

v.

**Claudine WOOLF, Appellee and Cross–Appellant.**

**No. 05–03–01099–CV.**

Court of Appeals of Texas, Dallas.

Oct. 20, 2004.

Carlyle H. Chapman, Jr. and Cynthia Keely Timms, L.L.P., Ellen L. Perlioni, Baker & McKenzie, John F. McCarthy, Jr., Littler Mendelson, Dallas, for Appellant.

William M. Lamoreaux, Dallas, Pamela Pitt, Law Office of Pamela Pitt, Angela

Alioto and Steven L. Robinson, San Francisco, CA, for Appellee.

Before Justices MORRIS, MOSELEY, and FITZGERALD.

## OPINION

Opinion by Justice FITZGERALD.

Appellee Claudine Woolf was an independent sales director for Mary Kay Inc. in March 1997 when she learned she was pregnant with her first child. The same month, Woolf was diagnosed with cancer. Woolf ultimately brought suit against Mary Kay Inc. under a California statute, alleging Mary Kay failed to accommodate her disability. The jury rendered a verdict in favor of Woolf, and the trial court's judgment adopted the jury's verdict except for its award of punitive damages. In this Court, Mary Kay argues there is legally insufficient evidence supporting the jury's finding that Woolf was Mary Kay's employee, the necessary threshold for liability under the California statute. We conclude as a matter of law that Woolf was not Mary Kay's employee. Accordingly, we reverse the trial court's judgment.[1]

### BACKGROUND

Mary Kay manufactures cosmetics and enters into contractual relationships with individuals who purchase those cosmetics. The majority of those purchasers are "independent beauty consultants." The consultants may use the products themselves, or they may sell the products to other ultimate users. Consultants earn money by selling the products for more than they paid Mary Kay. Consultants may recruit new consultants. Some number of consultants who recruit enough new consultants[2] and maintain a particular level of purchasing from Mary Kay, become "independent sales directors."[3] A director may continue to sell Mary Kay products. She is also charged with "inspiring, motivating, counseling and aiding" the recruits who make up her "unit." In return, the director receives commissions based on the purchases made by members of her unit.

Woolf contracted to become a consultant in 1995. She was successful in both sales and recruiting, and she entered into a Sales Director Agreement (the "Agreement") with Mary Kay in September 1996. This Agreement governed the parties' relationship during the time period relevant to Woolf's lawsuit. The Agreement specifies that it will be governed by Texas law. It also provides that Woolf is an independent contractor and not an employee of Mary Kay.

Woolf made her claim against Mary Kay under California's Fair Employment and Housing Act, CAL. GOV'T CODE §§ 12900 et seq. (2004) [hereinafter, "FEHA"]. FEHA provides a recovery only to employees, thus excluding from its purview those who

---

1. Mary Kay also argues that there is insufficient evidence Mary Kay failed to accommodate Woolf's disability, there is insufficient evidence to support the jury's mental anguish damages award, and Woolf was not entitled to recover past and future lost wages awarded by the jury. In cross-points, Woolf argues the trial court erroneously granted Mary Kay's motion for judgment notwithstanding the verdict as to the jury's punitive damages award and erroneously reduced the original award of prejudgment interest. Because of our disposition of the employment-status issue, we need not reach these other issues.

2. The consultant's required number of recruits can also include her recruits' own recruits.

3. There are levels of director in this system, including "senior directors" and "executive senior directors." In this opinion we intend "director" to mean the entry-level sales director position held by Woolf.

are independent contractors.[4] Woolf argues that under California law, she was Mary Kay's employee. Mary Kay takes the position that Texas law should govern this issue, that Woolf was an independent contractor, and that the evidence is both legally and factually insufficient to support the jury's finding that Woolf was Mary Kay's employee.

## CHOICE OF LAW

■ Contracting parties frequently express their own choice of law for the construction and interpretation of their agreement. Our supreme court has stated that judicial respect for such a choice advances the policy of protecting the parties' expectations. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 677 (Tex.1990). Accordingly, the parties' contractual choice of law will be given effect so long as the contract bears a substantial relationship to the chosen state and so long as the parties' choice does not thwart a fundamental policy of the state whose law would otherwise be applied. *See id.* (adopting rule of RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187, "Law of the State Chosen by the Parties").

■ In this case, neither party questions that there is a "substantial relationship" between Texas and these parties. Instead, the argument centers on the sec-

ond prong of the *DeSantis* test. That prong rejects application of the parties' choice of law when:

> application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* at 678 (quoting RESTATEMENT at § 187(2)(b)). This second prong of the test incorporates three necessary elements.[5] However, we need consider only one to establish that this second exception does not apply. If we were to assume, without deciding, that California law had a more significant relationship to these parties than Texas law; and if we were to assume, without deciding, that California had a materially greater interest than Texas in deciding whether Woolf was an employee or an independent contractor; then we would still need to determine whether application of Texas law to the employment-status decision would violate a "fundamental policy" of California. Woolf has identified no such policy. She argues that "the public policy embodied by the California Fair Employment and Housing Act is

---

4. The relevant section of FEHA provides:

> It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:
>> (m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or *employee.*

CAL. GOV'T CODE § 12940(m) (emphasis added).

5. *DeSantis* identified the elements in its case as follows:

> Whether that exception applies depends upon three determinations: first, whether there is a state the law of which would apply under section 188 of the RESTATEMENT absent an effective choice of law by the parties, or in other words, whether a state has a more significant relationship with the parties and their transaction than the state they chose; second, whether that state has a materially greater interest than the chosen state in deciding whether this noncompetition agreement should be enforced; and third, whether that state's fundamental policy would be contravened by the application of the law of the chosen state in this case. *Id.* at 678.

'fundamental.'" However, FEHA, by its own terms, excludes independent contractors from its protection. *See* CAL. GOV'T CODE § 12940(m). We find no statement of policy that makes the actual classification of workers as employees or independent contractors a fundamental policy.[6] To the contrary, California also makes such classifications and—based on those classifications—determines workers' rights, just as Texas does. The fact that applying Texas law would lead to a different result does not mean its application is contrary to any fundamental policy of California. *See DeSantis,* 793 S.W.2d at 680.

We conclude the parties' choice of law provision is not undermined by either exception to the rule calling for application of that choice. Accordingly, we will apply Texas law in determining Woolf's employment status.

### WOOLF'S EMPLOYMENT STATUS

 Mary Kay first challenges the legal sufficiency of the evidence supporting the jury's finding that Woolf was its employee. When, as in this case, the appellant challenges the legal sufficiency of the evidence to support a finding on which it did not have the burden of proof at trial, the appellant must demonstrate that no evidence exists to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). We will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla;

or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex. 2003). "Although it is often stated that a reviewing court performing a no-evidence review must disregard all evidence contrary to the finding in question, we need not 'disregard undisputed evidence that allows of only one logical inference.'" *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2002) (quoting *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex. 1997)).

The Texas Supreme Court has recently set forth the test to determine whether a worker is an employee or an independent contractor: whether the employer has the right to control the progress, details, and methods of operations of the work. *Limestone Prods. Distribution, Inc. v. McNamara,* 71 S.W.3d 308, 312 (Tex.2002). The court identified five factors that help "measure" the right to control: (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for which the worker is employed; and (5) the method of payment, whether by unit of time or by the job. *Id.* In *Limestone Products,* the court applied this "right-to-control test" and concluded the defendant's truck driver was an independent contractor as a matter of law. *Id.* at 313. We set forth the court's factual analysis because it guides our own:

> Although Limestone told [the driver] where to pick up and drop off loads, and

---

**6.** In another context, Woolf's brief represents that "[u]nder California law, an individual providing services to another is presumed to be an employee." If this statement of the law were true, it might speak to a California policy concerning the classification of workers.

However, the statute to which Woolf refers actually states that "[a]ny person rendering service for another, *other than as an independent contractor,* or unless expressly excluded herein, is presumed to be an employee." CAL. LABOR CODE § 3357 (2004) (emphasis added).

[the driver] had to turn in his load tickets to get paid, he had broad discretion in how to do everything else. [The driver] was free to drive any route he wished when delivering for Limestone as long as he timely delivered the load. [The driver] did not work regular hours and did not have to visit the office on a regular basis. Moreover, Limestone supplied no tools or equipment to [the driver.] Instead, [the driver] owned and used his own truck for deliveries, and he paid for his own gasoline, repairs, and insurance. Limestone paid [the driver] by the load he delivered, and he received no pay if there was no work. Limestone reported [the driver's] income on a 1099 form, not a W–2 form. Also, Limestone did not pay [the driver] for vacation, sick leave, or holidays. And [the driver] paid his own social security and federal income taxes.

*Id.* at 312–13.

The facts concerning Woolf's status were elicited from Woolf herself, from Mary Kay employees, from other consultants and directors, and from trial exhibits such as the Agreement and Woolf's tax returns for the years she operated her business. Although Woolf sometimes attempted to characterize her working conditions differently, she testified to the same basic facts as the other witnesses. We set forth those facts with the *Limestone Products* factors in mind.

Mary Kay sold its cosmetics to Woolf for resale. Mary Kay directed the cosmetics must be sold to end users (i.e., not to retail establishments) and circumscribed the use of Mary Kay trademarks, but otherwise Woolf had broad discretion in how she operated her business. She did not work any particular hours; she could work as much or as little as she chose. She could sell the cosmetics to any user or keep them for her own use. She could sell them in any geographic area in the country. She set her own prices for the cosmetics, thus controlling the profit she made from the sales aspect of her business. She could (and did) choose to recruit more consultants and try to qualify as a director, or she could remain a beauty consultant with no monthly purchase requirements. As a director, Woolf voluntarily took on the requirement of meeting monthly purchase obligations with her unit. She rented her own office space and purchased her own computer, equipment, business clothes, and business cards. If she chose to attend Mary Kay seminars, she paid her own way. She received no traditional employee benefits from Mary Kay: no health insurance, vacation, or holiday pay. Her pay was categorized as commission.[7] Her checks were not subject to withholding, and Mary Kay reported Woolf's income on a 1099 form, not a W–2 form. Woolf paid her own federal income tax and self-employment tax. She consistently represented to the Internal Revenue Service that she was self-employed. We conclude that these factors provide conclusive evidence that Woolf was an independent contractor and not Mary Kay's employee. *See id.* at 313.

Despite the above-listed facts, Woolf offered evidence at trial that she felt controlled by Mary Kay; she testified that she felt she had to follow suggested company methodology if she wanted to be successful. Such testimony is not evidence of Mary Kay's right to control the details of Woolf's work. The record establishes

---

**7.** Although this mode of payment does not fall neatly within the *Limestone Products* classification of pay "by unit of time or by the job," it clearly is tied to the amount of purchases made by the unit. We conclude being paid, in effect, by the purchase is closer to being paid by the job than being paid by the hour.

that the suggestions included within the Reference Manual for Independent Mary Kay Sales Directors, or offered at attendance-optional seminars, or given by other sales directors, were nothing more than recommendations that had proven successful for other independent salespersons. Woolf was free to accept them, modify them for her use, or reject them out of hand.[8] The record is clear that rejection of such suggestions did not cause a salesperson to incur any penalties.

■ Woolf also depends heavily on the fact that either party could terminate the Agreement for any reason on thirty days notice. Woolf characterizes this arrangement as employment at will. She argues that parties to a contract cannot quit or be fired as parties to an employment relationship can, because to do so would amount to a breach of the contract. Under the facts of this case, we disagree. Our review of the Agreement makes clear that the termination provision is simply the parties' agreement concerning how their contractual relationship can be brought to an end. There can be no breach of contract when the manner of termination of the relationship is the manner contemplated by the contract's own terms. We reject Woolf's argument that Mary Kay's right to terminate the Agreement was evidence Woolf was an employee rather than an independent contractor. *See Cont'l Ins. Co. v. Wolford,* 526 S.W.2d 539, 541–42 (Tex. 1975) (right to discharge worker not evidence that details of work were subject to principal's control; worker was independent contractor as matter of law).

We conclude there was "no more than a mere scintilla" of evidence that Woolf was Mary Kay's employee. Further, we conclude the evidence conclusively established the opposite fact, that Woolf was an independent contractor. Accordingly, the evidence was legally insufficient to support the jury's finding that she was Mary Kay's employee. *See Marathon Corp.,* 106 S.W.3d at 727. We decide Mary Kay's first issue in its favor.

### CONCLUSION

Given our resolution of Mary Kay's first issue, we need not address the parties' remaining issues. We reverse the trial court's judgment and render judgment that Woolf take nothing on her claim against Mary Kay.

---

8. At trial, Woolf relied repeatedly on materials from the Reference Manual as statements of required conduct. However, the first page of that manual stresses that the ideas therein were "gathered in one manual for you [i.e., the director] to review and accept or reject."