**EMERSON ELECTRIC CO. d/b/a Chromalox, Appellant**

v.

**AMERICAN PERMANENT WARE CO., Appellee.**

**No. 05–04–01266–CV.**

Court of Appeals of Texas, Dallas.

Aug. 15, 2006.

Rehearing Overruled Oct. 9, 2006.

Scott J. Atlas, Weil, Gotshal & Manges LLP, Houston, Richard Illmer, Brown, McCarroll, L.L.P., Dallas, and Penelope E. Nicholson, Law Office of Vinson & Elkins, L.L.P., Houston, for Appellant.

Scott S. Hershman, Lackey Hershman, L.L.P., Dallas, and John W. Bickel II, Bickel & Brewer, Dallas, for Appellee.

Before Chief Justice THOMAS and Justices WHITTINGTON and FRANCIS.

## OPINION

Opinion by Justice FRANCIS.

This appeal arises out of a dispute between American Permanent Ware Co. (APW) and Emerson Electric Co. d/b/a Chromalox over the design and manufacture of heating elements for a bagel toaster. A jury found Emerson liable on APW's claims for breach of contract and breach of express and implied warranties and awarded more than $2.1 million in damages. The trial court rendered judgment on the jury's verdict and also awarded attorney's fees as well as pre- and post-judgment interest.

In sixteen issues, Emerson challenges the liability findings, the trial court's directed verdict on its limitation of remedies and disclaimer of warranty issues, the attorney's fee award, and the failure to allow a settlement credit. In a cross-issue, APW complains the trial court erred in failing to award an additional $19.5 million in damages. For reasons set out below, we sustain the issue regarding the settlement credit, reverse the judgment with respect to that issue only, and remand for the trial court to (1) deduct the full amount of the Maytag settlement from APW's damage award and (2) recalculate the amount of prejudgment interest on the actual damages. We affirm the trial court's judgment in all other respects.

Einstein Brothers Bagels asked APW to design a fifteen-second bagel toaster. At the time, the standard toasting time for bagels was forty-five to sixty seconds. In response, APW designed the BT–15, a toaster with a conveyor belt requiring multiple heating elements. In 1995 and 1996, APW sent out heating element specifications to four potential manufacturers, including Emerson. The specifications required a one-year warranty. Although Emerson bid on the contract, APW select-

ed Heatube, a division of Maytag, to manufacture the elements.

In April 1998, Emerson purchased the assets of Heatube from Maytag and assumed its contractual obligations, including the manufacture of the heating elements. Emerson continued to supply APW with heating elements manufactured in the Heatube plant until late 1998 when Emerson transferred production of the elements to its Chromalox plant. Up until that point, APW had purchased fewer than 250 elements.

In 1998, APW received orders for 15,000 BT–15 toasters from two restaurant chains, McDonald's and Kentucky Fried Chicken. The first of the three major bagel toaster rollouts took place in January 1999. Three months later, APW informed Don Shuhart of Don Shuhart Company, Emerson's manufacturing representative, that a significant number of heating elements failed while in use in the toasters. Consequently, in April, Shuhart visited the APW plant. During that visit, Shuhart observed the manufacturing of the BT–15 toaster and saw APW employees bending the elements during the assembly process. Believing the bending was causing the elements to fail, Shuhart suggested APW change its assembly process. APW instituted the change, but the failures continued.

At that point, Shuhart recommended sealing the crown of each element with silicone, and APW returned the elements to Emerson for sealing. When sealing the elements did not decrease the failure rate, Shuhart suggested Emerson had produced a "bad" batch of elements, identified at trial as R–1. In response, APW purged all R–1 elements from its inventory, but again the failures continued. Shuhart then told APW there was a problem with a second batch of elements, R–2, and advised APW to stop using those elements. APW

purged the R–2 batch of elements from its inventory. Still, the elements continued to fail.

In September 1999, APW informed Emerson it had incurred more than $77,000 in expenses related to the element failures. In addition to purchasing new elements, APW expended funds in shipping and service fees because it had to replace elements at numerous restaurants across the country. APW's director of technical services and customer service, Bart Bolton, testified he was receiving 100 complaints a day regarding the failed elements and was working fourteen to sixteen hours a day, six days a week, to try to resolve the issues. Bolton testified he had to hire temporary workers to assist him in handling the complaints. By November 1999, APW estimated it had spent nearly $300,000 related to element failures.

In the last quarter of 1999, APW sent a bagel toaster to Emerson for inspection. At a December meeting, Emerson suggested that APW wire the elements "in series" rather than "in parallel" and lower the voltage for each element. However, Emerson could not assure APW that this would cure the problem. Since Emerson had not identified a specific cause for the element failures, APW sought assistance from Watlow, another element manufacturer. Watlow determined there was a design flaw in that the elements required a thicker wire to withstand the heat produced inside the bagel toaster. In addition, Watlow suggested wiring the elements in series. Watlow produced new elements, and at the time of trial, APW had placed 100,000 Watlow elements in toasters in the field with only fifty complaints.

In December 2000, Emerson division president John Stoops wrote a letter to APW denying that the element failures were the result of "any defect in our product but solely the result of APW's misapplication and inappropriate appliance design." Stoops notified APW that, in light of APW's refusal to modify the toaster design "and the currently pending litigation," Emerson would no longer supply APW with the heating elements. (APW filed lawsuits against Emerson in February and July 2000, but dismissed both. Emerson filed this suit in September 2000.)

APW and its parent company, Associated American Industries, Inc. (AAI), sued Maytag and Emerson as well as the Donald Shuhart Company for breach of contract, breach of express and implied warranties, negligence, negligent misrepresentation, DTPA violations, fraud, and fraud in the inducement. The trial court granted summary judgment against AAI on all of its claims and against APW on its claims for negligence, negligent misrepresentation, and fraud. APW settled with Maytag before trial. The remaining claims were tried to a jury.

Following a six-week trial, the trial court granted a directed verdict against Emerson on its affirmative defenses that it disclaimed warranties and limited the buyer's remedies. The jury found in APW's favor on its breach of contract and warranty claims and awarded the same damages for each: $1,831,000 for out-of-pocket expenses and $333,000 in lost profits, incurred after April 23, 1998. APW's claim for attorney's fees was tried to the court, which did not require APW to segregate the fees and awarded $2,678,904. This appeal ensued.

■ In its first issue, Emerson complains APW cannot recover for breach of contract as a matter of law because APW accepted the elements and, under the Uniform Commercial Code, was therefore limited to breach of warranty claims. Al-

though Emerson acknowledges that the UCC does not preclude contract damages when the buyer has either rejected or revoked acceptance of the goods, it argues APW failed to plead, prove, or obtain a jury finding on that issue and there is no legally and factually sufficient evidence to support such a finding. We begin with Emerson's complaint regarding APW's pleadings.

Texas follows a "fair notice" standard for pleading, which tests whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex.2000); *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 677 (Tex.App.-Dallas 2004, pet. denied). "A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim." *Horizon*, 34 S.W.3d at 897. The rule's purpose is to give the opposing party information sufficient to enable him to prepare a defense. *Id.*

An opposing party should use special exceptions to identify defects in a pleading so the other party can cure them, if possible, by amendment. *Id.; COC Servs.*, 150 S.W.3d at 677. Texas Rule of Civil Procedure 90 governs special exceptions:

> Every defect, omission or fault in a pleading either of form or of substance, which is not specifically pointed out by exception ... shall be deemed to have been waived by the party seeking reversal on such account. . . .

TEX.R. CIV. P. 90. When a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader. *Horizon*, 34 S.W.3d at 897; *COC Servs.*, 150 S.W.3d at 654.

Emerson did not specially except to APW's breach of contract claim. Given this failure, we question whether Emerson has preserved this issue for review. Regardless, construing the pleadings liberally in APW's favor, we conclude they are sufficient to put Emerson on notice of the issue of rejection or revocation of acceptance.

In its ninth amended petition, APW alleged facts to sustain both a breach of contract and breach of warranty cause of action. In particular, APW alleged that Emerson continued to produce and sell the Maytag-designed heating elements; the elements were defective; and the defects forced APW to replace them in a large number of toasters nationwide. APW further alleged that it "advised Emerson of the ongoing failures and associated replacement costs and requested that Emerson reimburse it for the expenses it incurred as a result of the defective heating elements." Although Emerson argues this allegation "at best merely alleges that APW notified Emerson of non-conformity," we disagree and conclude it can be fairly read to allege that Emerson was put on notice that APW rejected or revoked its acceptance of the defective elements.

Even assuming the pleadings were not sufficient, however, a party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating that both parties understood the issue was in the case, and the other party failed to make an appropriate complaint. *See Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 719 (Tex.App.-Dallas 2004, no pet.). To determine whether an issue was tried by consent, the reviewing court must examine the record, not for evidence of the issue, but rather for evidence of trial of the issue. *Id.*

In closing argument, Emerson acknowledged that APW returned elements to Emerson in December. 1999 but argued that APW continued to buy its elements despite its knowledge of the problems with the elements. APW argued to the jury that since Emerson continued to assure APW that it was attempting to solve the problem with the failing elements, it was appropriate for APW to continue to buy and replace the elements. We conclude this is evidence that the issue of revocation of acceptance was tried by consent.

Emerson next complains APW failed to obtain a jury finding on rejection or revocation of acceptance and is therefore precluded from recovering for breach of contract. Again, we disagree.

Questions one, two, and three submitted APW's breach of contract claim. Jurors were asked whether Emerson agreed to provide heating elements to APW that would work in the BT–15 toaster for a period of at least one year; whether Emerson failed to comply with the agreement; and, if so, as a result of that breach, the amount due to APW for out-of-pocket expenses, lost profits, and lost good will incurred after April 23, 1998. The jury affirmatively answered the questions and awarded damages for out-of-pocket expenses and lost profits.

With respect to this claim, neither Emerson nor APW objected to the trial court's failure to submit an issue on rejection or revocation of acceptance in the jury charge. If an entire theory of recovery is omitted from the jury charge, it is waived and a defendant does not have to object. *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990). Where an issue is omitted which constitutes only a part of a complete and independent ground and other issues necessarily referable to that ground are submitted and answered, the omitted elements are deemed found in

support of the judgment if no objection is made and they are supported by sufficient evidence. *See* Tex.R. Civ. P. 279; *Frito–Lay, Inc.*, 784 S.W.2d at 668; *E–Z Mart Stores v. Hale*, 883 S.W.2d 695, 698 (Tex. App.-Texarkana 1994, writ denied). The "necessarily referable" element is designed to give parties fair notice of, and opportunity to object to, a partial submission. *Wal–Mart Stores, Inc. v. Renteria*, 52 S.W.3d 848, 850 (Tex.App.-San Antonio 2001, pet. denied).

Contracts relating to the sale of goods are governed by article two of the UCC, adopted in Texas as chapter two of the business and commerce code. Tex. Bus. & Com.Code Ann. § 2.102 (Vernon 1994). Under the UCC, the critical factor in whether the buyer has a breach of contract or breach of warranty claim is whether the buyer has finally accepted the goods. Tex. Bus. & Com.Code Ann. §§ 2.711 & 2.714 (Vernon 1994); *Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex.App.-Dallas 2003, no pet.). A buyer who rightfully rejects the goods or justifiably revokes his acceptance may recover breach of contract remedies for delivery of non-conforming goods under section 2.711. Tex. Bus. & Com.Code Ann. § 2.711(a); *Selectouch*, 111 S.W.3d at 834. In other words, for APW to recover on its breach of contract claim, APW had to prove that it either rejected or revoked acceptance of the elements. The issue was not an independent theory of recovery; it was a component of APW's breach of contract claim and necessarily referable to it. *See Frito–Lay, Inc.*, 784 S.W.2d at 668 (omitted element of managerial capacity supported by some evidence deemed found); *Renteria*, 52 S.W.3d at 850 (concluding deemed finding could be made on control element in premises liability claim). Under these circumstances, we fail to see how Emerson could not have had notice of the issue.

Having reached this conclusion, we next address whether there was sufficient evidence to support a deemed finding on the issue.

 In its brief, Emerson argues while APW did inform it that the elements had failed, mere notice that goods are nonconforming is not sufficient notice of rejection or revocation of acceptance. Rather, Emerson asserts clear and unambiguous notice that the buyer will not accept the goods is required, and APW acted ambiguously by continuing "to demand" that Emerson continue to supply elements even after APW sued Emerson and Emerson "chose to stop selling elements to APW."

In this case, the evidence showed that APW did more than notify Emerson that the elements had failed; it rejected acceptance of some, refused acceptance of others, demanded replacement elements, refused to purchase additional elements, and insisted the elements be modified. As an example of evidence, in a letter dated May 13, 1999, a few months after the initial McDonald's rollout, Don Shuhart, Emerson's representative, wrote Emerson a letter stating that APW had placed a hold on using any of the 3900 Heatube elements pending study of the premature element failure and that APW would not accept any more Heatube elements until the problem was resolved. Further, Shuhart informed Emerson that APW had "pending orders for 40,000 more elements, which are being held pending the outcome of this problem." Shuhart sent this letter after APW had reported problems to Emerson in April 1999 and APW had changed its assembly procedure in response to Shuhart's suggestions. The suggestions, however, did not resolve the problem.

In addition to this evidence, Joe Mullen, APW's purchasing manager, testified that APW returned elements to Emerson in May or June 1999 because Shuhart told

them the elements had not been properly sealed. Finally, there was evidence that APW purged its inventory of two defective batches of heating elements, R–1 and R–2, in 1999. In fact, as one APW representative testified, the problem was so widespread that Emerson could not make the elements as fast as they were failing.

As for evidence that APW continued to purchase elements, APW representatives testified they continued buying the elements because Emerson assured them "time and time again" that the elements were okay to use and because APW had to "keep our customers going ... until we could find a solution." As for Emerson's reliance on its own refusal to provide more elements, that evidence weighs not in favor of Emerson, but in favor of APW. *Cf. Paul Mueller Co. v. Alcon Labs.*, 993 S.W.2d 851, 856 (Tex.App.-Fort Worth 1999, no pet.) (concluding formal revocation of acceptance not required when seller of metal tanks with latent defects declared it would not participate in any way to cure problem and disclaimed all liability). We conclude this is legally and factually sufficient evidence to support a deemed finding that APW rejected acceptance or revoked acceptance of the elements. Accordingly, we reject Emerson's first issue.

In its second issue, Emerson asserts there is no evidence of the contract found by the jury. In its opening brief, Emerson dedicates six sentences to this entire issue:

The jury was asked, "Did Emerson agree to provide heating elements to APW that would work in the BT–15 toaster oven for a period of at least one year?" [Record citation omitted.] There is no legally or factually sufficient evidence to support the jury's affirmative answer to that question.

Although the bid drawing that APW circulated in 1996 specified that APW

wanted a one-year warranty on the elements, Emerson lost the bid to Maytag. [Record citations omitted.] APW's dealings with Maytag are not relevant to any contract with Emerson. [Footnote omitted.] Nor can Emerson's one-year limited warranty support the jury's breach of contract findings. [Record citation omitted.] As discussed above, Texas law distinguishes between recovery for breach of warranty and breach of contract, and a warranty provision cannot form the basis for contract recovery. [Footnote and case citation omitted.]

In its reply brief, Emerson addressed the evidence relied on by APW to support legal sufficiency of the evidence. As in the opening brief, Emerson's only citation to the law focuses on the distinction between breach of warranty and breach of contract claims. Given the lack of legal citation and analysis, we question whether this issue is adequately briefed. *See* TEX.R.APP. P. 38.1(h). Regardless, after reviewing the evidence, we conclude it is legally sufficient to support the jury's finding.

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). There is legally insufficient evidence or "no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Wilson,* 168 S.W.3d at 810; *Mary Kay Inc. v. Woolf,* 146 S.W.3d 813, 817 (Tex.App.-Dallas 2004,

pet. denied), *cert. denied,* 544 U.S. 1061, 125 S.Ct. 2530, 161 L.Ed.2d 1112 (2005). More than a scintilla of evidence exists when the evidence supporting the finding as a whole "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (quoting *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 183 (Tex.1995).

Evidence at trial showed that at the time APW first solicited bids for the manufacture of the heating elements for the BT–15 toaster, the specifications expressly required a one-year warranty. Emerson bid on the job, but Heatube, a division of Maytag, won the bid. Two years later, Emerson purchased Heatube's assets from Maytag, assumed its contractual obligations, and began providing heating elements to APW. This evidence, in conjunction with the testimony of Emerson's agent, Shuhart, that APW always requested a one-year warranty and Mullen's testimony that, with respect to "these elements," he never agreed to any warranty limitations other than a one-year warranty, is more than a scintilla of evidence to support the jury's finding that APW and Emerson had a contract for Emerson to provide heating elements in the BT–15 toaster that would last one year. Consequently, there is legally sufficient evidence to support the jury's affirmative finding to the breach of contract claim. We note that Emerson's brief asserts the evidence is factually insufficient; however, Emerson has not briefed this issue and we consider it waived. Regardless, the above evidence is not so weak as to render the jury's

findings manifestly unjust. *See Lewis v. Dallas Soundstage, Inc.*, 167 S.W.3d 906, 912 (Tex.App.-Dallas 2005, no pet.). We reject issue two. Our disposition of this issue makes it unnecessary to address issues three, four, five, six, seven, and sixteen related to the findings on the breach of warranty claims. *See* TEX.R.APP. P. 47.1.

In its eighth and ninth issues, Emerson contends that even if APW can recover on one or more of its claims, the damages must be limited to the purchase price of the elements in accordance with the limitation-of-remedies provision contained in its acknowledgment forms, invoices, instructions, and catalogs. Emerson argues the trial court erroneously disallowed the issue after concluding the provision was not conspicuous when the statute does not require conspicuousness.

In reviewing a directed verdict, this court considers all evidence in a light most favorable to the losing party against whom the directed verdict was instructed, disregards all contrary evidence, and gives the losing party the benefit of all reasonable inferences created by the evidence. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex. 2004). The reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided the verdict can be supported on another basis. *Robbins v. Payne*, 55 S.W.3d 740, 746 (Tex.App.-Amarillo 2001, pet. denied).

We need not decide whether a limitations of remedies provision must be conspicuous, because even if the statute does not require it, the statute does require an express agreement between the parties.

Section 2.719 of the business and commerce code allows parties to limit remedies and provides in part as follows:

(a) Subject to the provisions of (b) and (c) of this section and of the preceding section on liquidation and limitation of damages,

(1) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(2) resort to a remedy as provided is optional unless the remedy is *expressly agreed* to be exclusive, in which case it is the sole remedy.

TEX. BUS. & COM.CODE ANN. § 2.719 (Vernon 1994) (emphasis added). Thus, if the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed. *Id.* at § 2.719(a)(2) cmt. 2.

■ As evidence it limited the buyer's remedies, Emerson relies solely on Defense Exhibit 305A. Exhibit 305A is a blank acknowledgment form. Assuming an acknowledgment form would create an express agreement as contemplated by the statute, Emerson has not directed this Court to *any* evidence that the blank form is in fact the same form sent to APW when acknowledging the purchase orders for the elements. In its reply brief, Emerson cites to portions of Mullen's testimony; however, Mullen's testimony only established that Emerson generally sent an acknowledgment form to APW, but Mullen was not asked about Defense Exhibit 305A.

■ It is not the duty of this Court to make an independent search of the record for evidence supporting a party's position. *See Most Worshipful Prince Hall Grand Lodge v. Jackson*, 732 S.W.2d 407, 412 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

Because Emerson has not directed us to any evidence that the acknowledgment form it relies upon to limit remedies is the same form sent to APW, we conclude Emerson has not shown reversible error. We therefore reject issues eight and nine.

In its tenth issue, Emerson asserts that APW has no basis for recovery under the DTPA. This issue does not complain about any reversible error in the judgment; rather, it appears that Emerson anticipates the argument made in APW's cross-appeal. As no reversible error is asserted, we do not address this issue except as necessary to APW's cross-appeal.

In its eleventh issue, Emerson argues that APW is entitled to only "one satisfaction" of its claim and the trial court erred by failing to apply a credit based on APW's settlement with Maytag. In response, APW argues that the claims against Emerson and Maytag were two different claims, as reflected in the jury charge that limited damages resulting from Emerson's conduct to those incurred after April 23, 1998, the date of Emerson's acquisition of Maytag's Heatube division. We agree with Emerson.

The one-satisfaction rule prohibits a plaintiff from recovering twice for a single injury. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex.2000); *Vanasek v. Underkofler,* 50 S.W.3d 1, 10 (Tex.App.-Dallas 1999), *rev'd on other grounds,* 53 S.W.3d 343 (Tex.2001). The rule applies when defendants commit the same acts as well as when defendants commit technically differing acts that result in a single injury. *Casteel,* 22 S.W.3d at 390; *Vanasek,* 50 S.W.3d at 10. The fact that more than one defendant may have caused the injury or that there may be more than one theory of liability does not modify this rule. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 8 (Tex.1991). Whether the rule applies is determined not by the cause

of action, but by the injury. *See Sterling,* 822 S.W.2d at 7–8. Moreover, the absence of tort liability does not preclude the application of the one-satisfaction rule. *Oyster Creek Fin. Corp. v. Richwood Inv. II, Inc.,* 176 S.W.3d 307, 327 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

Although APW pleaded several causes of actions against both Emerson and Maytag, its suit was predicated on one event: Emerson's failure to provide an element that would last in APW's toaster oven for one year. In its ninth amended petition, which was the live pleading at the time of APW's settlement with Maytag, APW asserted that its arrangement to purchase heating elements from Heatube did not materially change when Emerson acquired Heatube:

> Emerson subsequently purchased the Maytag plant where the elements for APW's toaster application were designed and being produced. APW continued to buy the Maytag designed elements from Emerson who continued to produce and sell the elements. Although it had the opportunity and conducted a design review, Emerson did not materially change the Maytag design. Instead it continued to build the same defectively designed element and supply that element to APW.

In the portion of the petition designated as "Breach of Contract," APW alleges that Maytag and APW entered into an oral agreement in 1996 by which Maytag would design and manufacture heating elements for APW's toaster and Maytag breached the agreement by designing an element that was unsuitable. APW further alleged that when Emerson purchased the Maytag plant, it assumed Maytag's contractual liabilities. APW alleged the parties entered into an oral agreement by which Emerson would design and manufacture elements

for APW's toaster; Emerson slightly redesigned and manufactured the element; and Emerson breached the agreement by failing to design and manufacture elements suitable for the toaster.

APW then alleged that as a result of Maytag's and Emerson's breaches, APW suffered actual and consequential damages, which include "the money APW spent purchasing the heating elements to be used in the McDonald's and Tricon toasters; the money spent mitigating damages and replacing those heating elements; and consequential and special damages in the amount of $29,500,000.00, including lost value, reputational harm, and lost goodwill." APW did not allege that Maytag was responsible only for damage incurred before April 23, 1998; it generally alleged that both parties were responsible for the damages. Moreover, APW's settlement agreement did not attempt to hold Maytag responsible only for damages incurred before April 23, 1998.

In sum, all of APW's causes of action against both defendants are based on the same promise to provide a heating element that would last in APW's toasters for one year and APW's right to recover for the defectively designed elements. Because there was a single injury caused by the design and production of defective elements, the one satisfaction rule applies and APW is entitled to credit for the Maytag settlement. Accordingly, we sustain the eleventh issue and remand to the trial court to (1) deduct the amount of Maytag's settlement from APW's jury award and (2) recalculate the prejudgment interest award on the actual damages. We sustain the eleventh issue.

In issues twelve through fifteen, Emerson contends the attorney's fee award should be set aside because (1) APW is not entitled to attorney's fees as a matter of law; (2) the fees were not segregated be-

tween eligible claims and ineligible claims; and (3) the award is excessive and not reasonable and necessary.

 A party must satisfy two requirements to obtain an award of attorney's fees: (1) he must prevail on a cause of action for which attorney's fees are recoverable and (2) he must recover damages. *Rodgers v. RAB Invs., Ltd.*, 816 S.W.2d 543, 551 (Tex.App.-Dallas 1991, no writ). APW meets both requirements. APW prevailed on its breach of contract claim, which we have affirmed, and recovered damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 1997). Consequently, APW is not precluded from obtaining an award of attorney's fees.

 Next, Emerson argues the attorney's fee award is improper because APW failed to segregate the fees. In particular, Emerson contends APW should have been required to segregate fees attributable to its successful claims from fees attributable to (1) claims for which the jury found no liability (DTPA and fraudulent inducement); (2) claims against Maytag; (3) claims dismissed on directed verdict or summary judgment; (4) claims against Don Shuhart Company, none of which were submitted to the jury; (5) claims asserted by AAI; (6) fees incurred for pursuing damages that APW failed to recover, i.e. damages for lost goodwill; and (7) claims on which APW prevailed but do not authorize recovery of attorney's fees, i.e. breach of warranty.

 When a plaintiff seeks to recover attorney's fees in a case involving multiple claims, at least one of which will support an award of attorney's fees and at least one of which does not, the plaintiff must offer evidence segregating attorney's fees among the various claims. *Sterling*, 822 S.W.2d at 10–11; *Park Cities Ltd. Partnership v. Transpo Funding Corp.*,

131 S.W.3d 654, 662 (Tex.App.-Dallas 2004, pet. denied). A recognized exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. *Sterling*, 822 S.W.2d at 11; *Park Cities*, 131 S.W.3d at 662. A plaintiff must either segregate the fees among the several claims or establish that the claims are sufficiently related. *See Sterling*, 822 S.W.2d at 10–11; *Park Cities*, 131 S.W.3d at 662. When the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable" the party suing for attorney's fees may recover the entire amount covering all claims. *Sterling*, 822 S.W.2d at 10–11.

The issue of attorney's fees was submitted to the trial court for decision, and two hearings on the issue were held. Although no witnesses testified, APW presented the affidavit of its attorney in support of attorney's fees. Attached to the seven-page affidavit is more than 700 pages of billing records in this case. Emerson presented no controverting evidence.

The trial court, after examining the file and taking judicial notice of the usual and customary attorney's fees in Dallas County, segregated $35,000 in fees incurred in connection with the Maytag settlement and awarded fees totaling $2,678,904.75. The trial court entered findings of fact and conclusions of law to support its decision, including that the claims arose out of the same transactions and were "intertwined to the point of being inseparable." Emerson argues there is no legally and factually sufficient evidence to support this finding. We disagree.

Attorney Hershman testified by affidavit that he was co-lead counsel for APW and that he participated in or oversaw every aspect of this case, including taking the vast majority of depositions, attending all of the discovery hearings, attending all of the substantive hearings, writing and/or reviewing correspondence, and attending mediation. Hershman said there was no one more familiar with the case or attorney's fees incurred by APW. Hershman further asserted that the attorney's fees were incurred in connection with APW's claims prosecuted through trial, and those claims "all arose out of the same acts and transactions and were so interrelated that their prosecution entailed proof or denial of essential the same facts." Emerson did not controvert this statement with any evidence of its own.

Further, having reviewed the record, we conclude all the claims in this lawsuit did arise out of the same transaction—APW and Emerson's agreement for Emerson to provide heating elements that would last one year in APW's bagel toaster—and are intertwined to the point of being inseparable. Without rehashing all of the evidence set out previously, this case began with Maytag/Heatube's agreement to provide the elements, Emerson's purchase of Heatube, and Emerson's continuing to provide the same elements, or slightly modified elements, with somewhat disastrous results. All of APW's claims revolve around these same set of facts, whether it be in the nature of breach of contract, breach of warranty, fraud in the inducement, or DTPA. Accordingly, we conclude the trial court did not err in determining the claims were inextricably intertwined. *See A.G. Edwards & Sons, Inc. v. Beyer*, 170 S.W.3d 684, 695 (Tex.App.-El Paso 2005, pet. filed) (concluding plaintiff's basis for contract claim was inseparably intertwined with plaintiff's tort claims); *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*,

3 S.W.3d 112, 131 (Tex.App.-Corpus Christi 1999, pet. denied) (concluding segregation not required because contract, fraud, negligent misrepresentation, and fraud in the inducement claims arose from same transaction and entailed proof of same facts).

■ Finally, Emerson argues the amount of fees awarded is excessive and unreasonable in light of the damages awarded and lack of complexity of the case.

■ The determination of reasonable attorney's fees is a question for the trier of fact. *Sterling*, 822 S.W.2d at 12. A court may consider factors such as the time and labor required, the complexity of the case, the preclusion of other employment by the lawyer, the fee customarily charged in the area for similar legal services, the results obtained, and the experience of the lawyer performing the services, among other factors. *SAS & Assocs., Inc. v. Home Mktg. Serv., Inc.*, 168 S.W.3d 296, 304 (Tex.App.-Dallas 2005, pet. denied). The amount of damages awarded is not the sole determining factor. *Id.*

In its findings, the trial court determined that APW's counsel spent nearly 7,500 hours on the case, most of which were incurred in trial preparations and attendance at the trial. The court found that this case was not of the type commonly referred to or handled by novice attorneys, but required a significant degree of skill and experience on both sides. Throughout the trial, the court was presented with several difficult legal questions, with numerous difficult questions of fact ultimately submitted to the jury. The court also found that given the four-year duration of the action, counsel was quite likely, if not certainly, precluded from performing legal services for other clients as a result of its work on this case. The trial court also took notice of the "large number

of defensive motions and approach taken by defense counsel." As an example, the court states Emerson requested "no fewer than five trial continuances, one of which included a request on the eve of trial claiming that Emerson would be prejudiced if required to proceed to trial without the presence" of Emerson's corporate representative, John Stoops. At the trial, however, Mr. Stoops was not present for more than two days and Emerson requested he be called out of order during APW's case-in-chief "to allow Mr. Stoops to avoid having to remain at trial." Finally, the court took notice of the decades of experience of APW's counsel, almost exclusively in the area of complex commercial litigation, and the results counsel consistently achieves for his clients.

Again, as previously noted, Emerson presented no controverting evidence on attorney's fees. Although Emerson characterizes this case as a "garden-variety warranty case," the trial lasted six weeks and multiple issues were submitted to the jury and others were decided by the trial judge. Although the attorney's fee award exceeds the damages awarded, that factor is not dispositive in light of the other factors found by the trial judge and not challenged by Emerson. To the extent Emerson urges the fees should have been segregated, we have already disposed of that issue. Based on the record before us, we cannot say the evidence that supports the award of attorney's fees is so weak that it is clearly wrong and manifestly unjust. We reject issues twelve through fifteen.

## CROSS-APPEAL

■ In its cross-appeal, APW argues the trial court erred in refusing to deem a finding that Emerson's breach of warranty was a producing cause of an additional $19.5 million in damages for lost goodwill. We disagree.

The breach of warranty question was based on the UCC, as reflected by the proximate cause element included in the question, and APW did not request a question on producing cause to support a DTPA warranty theory. Moreover, in response to the questions asked, the jury found that while APW did suffer damages for out-of-pocket expenses and lost profits, there was no damage to APW's goodwill as a result of the breaches.

Regardless, APW argues that since proximate cause subsumes producing cause, the findings to the warranty question should be read to support a DTPA warranty theory. Then, APW attempts to use the jury's answers to separate, unrelated questions to argue it is entitled to an additional $19.5 million in damages for lost goodwill.[1]

When a party does nothing to secure a fact finding at the trial court level, rule 279 provides for deemed findings only as a basis for affirming the trial court's judgment. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 565 (Tex.2002). In *Gulf States*, the supreme court reversed a court of appeals for deeming a finding of knowingly and rendering a new judgment that increased actual damages by nearly fifteen times the trial court's award. In reaching

its decision, the court explained that rule 279 may support a deemed finding only when it can be deemed found "in such manner as to support the judgment." *Id.* at 564 (quoting Tex.R. Civ. P. 279).

Here, APW did not submit a question on a DTPA warranty theory; the jury found APW's goodwill was not damaged by the only breach of warranty theory submitted; the questions relied upon for additional damages were not tied to any liability findings and were not necessarily referable to any DTPA liability question; and the trial court refused to imply any such finding. We conclude *Gulf States* is controlling. Accordingly, we reject the sole issue in APW's cross appeal.

In conclusion, we reverse the trial court's judgment as it relates to the settlement credit and remand to the trial court to (1) deduct the full amount of the Maytag settlement from APW's damage award and (2) recalculate the award of prejudgment interest on the actual damages in accordance with this opinion. We affirm the trial court's judgment in all other respects.

---

1. The answers APW relies on for additional damages were in response to questions that sought findings on the value of the assets of APW's parent company, AAI, to allow the trial court to determine whether APW was a consumer under the DTPA. *See* Tex. Bus. & Com. Code Ann. § 17.45(4) (Vernon 2002) (excluding from the statute's protections an entity that has assets of $25 million or more or that is owned or controlled by a corporation or entity with assets of $25 million or more). At the charge conference, the parties disagreed (1) as to whether the value of the goodwill of a company should be used to calculate a company's assets for DTPA standing purposes and (2) on the relevant date of the company's value. Consequently, the trial court submitted four predicate questions to encompass both positions: the total amount of the value of the company, excluding goodwill, at the time of the alleged deceptive trade practices and at the time the lawsuit was filed; and the value of the goodwill of AAI at the time of the alleged deceptive trade practices and at the time the lawsuit was filed. In answer to the latter two questions, the jury found the value of AAI's goodwill at the time of the alleged violations was $65 million and was $45.5 million at the time the lawsuit was filed, a $19.5 million difference. APW characterizes these answers as a "damage finding," although the questions were not linked to any liability finding, were clearly submitted to determine DTPA standing, and were not necessarily referable to any DTPA liability theory.