

**NUMBER 13-14-00039-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI – EDINBURG**

---

HENRY ANDREW HANSEN
II, M.D. AND CENTRAL TEXAS
VEIN CENTER, P.A.,                                    **Appellants,**

**v.**

THOMAS WILLIAM JACKSON,
REGIONAL EMPLOYEE ASSISTANCE
PROGRAM, COLLEGE STATION
MEDICAL CENTER, LLC, AND
COMMUNITY HEALTH SYSTEMS
PROFESSIONAL SERVICES CORPORATION,          **Appellees.**

---

On appeal from the 85th District Court
of Brazos County, Texas.

---

**MEMORANDUM OPINION**

**Before Chief Justice Valdez and Justices Garza and Longoria**
**Memorandum Opinion by Justice Longoria**

By five issues, which we address as three, appellant, Dr. Henry Andrew Hansen, II, M.D.,[1] challenges the trial court's grant of traditional summary judgment in favor of appellee Regional Employee Assistance Program (REAP), and traditional and no-evidence summary judgments in favor of appellees College Station Medical Center (the Hospital), Thomas Jackson (Jackson), and Community Health Systems Professional Services Corporation (PSC). We affirm in part and reverse and remand in part.

## I. BACKGROUND[2]

### A. Factual Background

In early 2007, Jackson, the Chief Executive Officer (CEO) of the Hospital, sought to hire a board-certified cardiovascular surgeon so that the Hospital could offer heart surgeries in-house without referring patients to other hospitals or paying to have a cardiovascular surgeon on call. After extensive negotiations in which appellant was represented by counsel, appellant signed an employment agreement (the Contract) with REAP to work at the Hospital. REAP was appellant's employer because the law prohibits the Hospital from employing physicians to practice medicine and receiving fees for the treatment.[3]

---

[1] The notice of appeal recites that the Central Texas Vein Clinic, an entity run separately by appellant, is also an appellant in this case. However, all of Hansen's arguments relate to his own employment with REAP, and he does not otherwise mention the clinic in his appellate brief. The clinic has not filed a separate brief.

[2] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

[3] Under the Texas Medical Practice Act, a corporation comprised of lay persons engages in the unlicensed practice of medicine if it employs licensed physicians to treat patients and the corporation receives the fee for the treatment. *See Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 752 (Tex.

The Contract had the following relevant provisions. The contract term was from June 1, 2007 to April 30, 2012.[4] Section 10.1 of the Contract provided that during the first three contract years, the Contract could be terminated only for cause. Following the end of third contract year, either party could terminate the contract without cause with sixty days' notice if "annual practice losses" exceeded $500,000 "at the end of years three, four or five." The Contract did not define the term "annual practice losses." The Contract further provided that in the event of termination without cause, appellant would "not be entitled to the due process rights established by Employer in its policies and procedures," but appellant would "be entitled to such due process rights if this Agreement is terminated for cause by Employer pursuant to sections 10.2, 10.3 or 10.4 of this Agreement."[5]

Shortly after appellant began working at the Hospital, Community Health Systems, the parent company of PSC,[6] purchased the Hospital. On February 11, 2009, Les Luke,

---

App.—Houston [14th Dist.] 2004, pet. denied) (explaining the "corporate practice of medicine" doctrine and collecting cases); *see also* TEX. OCC. CODE ANN. § 162.052(a) (West, Westlaw through 2013 3d C.S.). However, non-profit health organizations certified by the Texas Medical Board, and which have a board of directors composed of licensed physicians, may employ physicians to practice medicine. *See* TEX. OCC. CODE ANN. § 162.001(b) (West, Westlaw through 2013 3d C.S.) (setting out the general requirements for that type of organization). REAP is such a non-profit organization.

[4] Appellant maintains throughout his briefs on appeal that the termination date of the contract was May 30, 2012, but the record reflects that appellant and REAP signed an addendum to the contract making the termination date April 30, 2012.

[5] The full text of section 10.1 is as follows:

The Agreement can be cancelled for-cause only during years one through three. Either party may terminate this Agreement without cause if annual practice losses exceed Five Hundred Thousand ($500,000.00) at the end of years three, four or five, by providing not less than Sixty (60) Days prior written notice to the other party stating the intended date of termination. If Employer terminates this Agreement without cause or if this Agreement terminates by expiration or mutual consent, Physician shall not be entitled to the due process rights established by Employer in its policies and procedures. Physician shall be entitled to such due process rights if this Agreement is terminated for cause by Employer pursuant to sections 10.2, 10.3 or 10.4 of this Agreement.

[6] According to PSC's brief, PSC is a company owned by Community Health Systems that "provides advice on physician employment and termination decisions" to health care providers owned by Community Health Systems.

3

a Vice President of PSC, sent a letter to Jackson recommending that the Hospital terminate appellant's employment under the Contract at the end of the third contract year in June of 2010, the time that the Contract first permitted termination without cause. Luke's letter cited appellant's high "clinic losses" relative to his $750,000 base annual salary as a reason for recommending the termination. The letter also stated that continuing appellant's employment until June 2010 despite the losses was acceptable to permit the Hospital's associate cardiovascular surgeon to gain more experience.

During his time at the Hospital, appellant's primary source of patient referrals was a team of three cardiologists that worked together under the name of BCS Heart. Throughout 2009, appellant had a series of personal disagreements with two of the doctors from BCS Heart, Dr. Marcel Lechin, M.D. and Dr. Mario Lammoglia, M.D. The most prominent disagreement involved the two cardiologists' decision to place appellant and the Hospital on "drive-by" status, meaning that they would not refer new patients to appellant for surgery at the Hospital. Appellant, in turn, refused to accept patients from the two doctors until they "cleared the air" in a joint meeting. At the meeting, both cardiologists stated that they were not referring patients to appellant because his patients were not "doing well" during and after surgery.[7] Several days later, both cardiologists nevertheless agreed to resume referring patients to appellant for surgery. Appellant, however, refused to accept referrals from the two doctors until they signed an advertisement or some other sort of public affirmation of appellant's skills as a cardiovascular surgeon. There is no evidence that any affirmation was ever published.

---

[7] Jackson arranged for an independent review of the Hospital's cardiology program, which according to appellant, established that his patients' rates of mortality and morbidity were well within accepted norms.

4

On November 13, 2009, the REAP Board met for its annual meeting. We reproduce the following directly from the minutes of the meeting:

> ***Dr. Henry Hansen Situation***
> Les Luke briefly discussed the situation with Dr. Hansen, a cardiovascular surgeon in College Station, Texas. Dr. Hansen is refusing to see patients referred by two of the three cardiologists on the medical staff of College Station Medical Center, which is not consistent with his employment agreement with REAP. He did provide emergency assistance to Dr. Chris Gullett, another College Station cardiovascular surgeon on the medical staff of College Station Medical Center, but has otherwise not worked since September. This stems from a falling out with BCS Heart, a three-member cardiologist team. The purpose of the discussion was to prepare the Board for a possible termination should Dr. Hansen continue to not see patients referred by the two cardiologists and fulfill his duties per the employment agreement.

Appellant alleges that he actually agreed to again accept referrals from the two doctors at another meeting held on December 21, 2009, but whether appellant actually accepted patients after that time is a disputed issue that we discuss below. Appellant further alleges that during this time, he continued to perform procedures on patients referred to him by Dr. Miller, the third BCS Heart cardiologist.

On February 18, 2010, Ashley Bosshart, Luke's subordinate at PSC, sent an email to the Board members to set up a conference call to discuss appellant. The email, in pertinent part, reads as follows:

> As you may recall from our 2009 Annual Board Meeting, we discussed the possibility of terminating [appellant] due to his high losses and current behavioral issues. I have attached the 2009 Annual Board Meeting Minutes for you to review the information regarding [appellant].
>
> [Appellant's] annual losses are as follows:
>
> 2008 Losses: $1,003,138
>
> 2009 Losses: $908,609

5

Due to his past behavioral issues and his significant clinic losses, the CEO of the facility has requested that the 5.01(a) Board terminate [appellant's] employment agreement without cause. I have attached a letter drafted by the CEO, Tom Jackson, intended for [appellant]. Tom will not provide [appellant] with this letter until May 3, 2010, which is the date REAP contractually fulfills their part of [appellant's] agreement with regard to not terminating his contract without cause.

On February 23, 2010, the Board met via telephone conference call. The minutes reflect the following:

A. Bosshart was notified by Thomas Jackson, Chief Executive Office of College Station Medical Center, that REAP wished to terminate [appellant's] agreement without cause pursuant to section 10.1 of the agreement. Thomas Jackson discussed the below reasons with A. Bosshart as to why they wished to terminate Dr. Hansen.

• Dr. Hansen's clinic losses were $1,003,138 in 2008 and $908,609 in 2009.

• As discussed at the annual Board meeting, [appellant] continues to display several behavioral problems. The most significant being his unwillingness to see patients referred by two of the three cardiologists on the medical staff of College Station Medical Center, which is not consistent with his employment agreement with REAP. This stems from a falling out with BCS Heart, a three-member cardiologist team.

A member of the Board moved to terminate appellant on the basis of section 10.1 of the Contract. The Board voted unanimously in favor of the motion. Following the vote, Luke and Bosshart filled out a "Personnel Action Form" to reflect that appellant had been terminated for "unsatisfactory performance" and was not eligible for rehire.

## B. Legal Background

In October of 2010, appellant filed suit against REAP, the Hospital, Jackson, Dr. Lechin, and Dr. Lammoglia. Appellant alleged causes of action for business disparagement, tortious interference with contractual relations, conspiracy to commit

6

tortious interference with contractual relations, fraud in the inducement, participatory liability against Jackson and the Hospital, a claim for equitable accounting against REAP, and restraint of trade. Appellant later added a claim for breach of contract against REAP. In his Third Amended Petition, appellant added PSC as a defendant and asserted a claim for business disparagement against it.

The Hospital and Jackson moved for partial summary judgment on appellant's claims for restraint of trade. Dr. Lechin and Dr. Lammoglia filed a separate motion for summary judgment on all of appellant's claims. The trial court granted partial summary judgment to Jackson and the Hospital and granted summary judgment to the two cardiologists on all of appellant's claims except those for business disparagement. The trial court severed the claims against Dr. Lechin and Dr. Lammoglia into a separate proceeding that is not before us.[8] Jackson, the Hospital, and REAP then moved for summary judgment on all appellant's remaining claims. REAP moved for traditional summary judgment only on appellant's claim for breach of contract, but the motion is a hybrid motion as to the other claims. PSC filed a separate hybrid motion for summary judgment on all of appellant's claims.

While the new motions were pending, the trial court granted appellant's Second Motion to Compel, ordering appellees to turn over numerous documents, including the minutes of the meetings where the Board discussed appellant. Following the production

---

[8] The trial court later rendered judgment for Dr. Lechin and Dr. Lammoglia, and appellant appealed that judgment to the Tenth Court of Appeals. The parties reached a settlement agreement, and the Tenth Court of Appeals granted their joint motion to dismiss the appeal without reaching the merits. *See Hansen v. Lechin*, No. 10-13-00146-CV, 2013 WL 5952139, at *1 (Tex. App.—Waco Nov. 7, 2013, no pet.) (mem. op.).

7

of these documents, appellant filed his Sixth Amended Petition. In that petition, Appellant alleged the following causes of action: breach of contract and "breach of fiduciary and statutory duties" against REAP; business disparagement against Jackson, the Hospital, and PSC; tortious interference with contractual relations against Jackson and the Hospital; tortious interference with existing and prospective contractual relations against PSC; and restraint of trade against Jackson and the Hospital. PSC filed an amended motion for summary judgment shortly before the hearing on the motions, but Jackson, the Hospital, and REAP did not amend their summary judgment motion.

The trial court granted both motions in their entirety without stating the bases for its ruling. On appeal, appellant challenges the summary judgments only on the claims for breach of contract, business disparagement, and tortious interference.

## II. SUMMARY JUDGMENT STANDARDS OF REVIEW

We review a grant of summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). If the trial court did not specify the grounds on which it granted summary judgment, we must affirm if any of the grounds asserted in the motion are meritorious. *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). Where, as here, the motion asserts both no-evidence and traditional grounds, we first review the summary judgment under the no-evidence standard of review. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the respondent failed to produce more than a scintilla of evidence under the standard of Rule 166a(i), there is no need to analyze whether the movant's summary-judgment evidence satisfied the standard for traditional summary judgment. *Id.*

8

By a no-evidence motion, the movant alleges that no evidence exists for one or more essential elements of a claim on which the respondent bears the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). The trial court must grant the motion unless the respondent produces evidence that raises a genuine issue of material fact on each of the challenged elements of the claim. *Hamilton*, 249 S.W.3d at 426; *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). A genuine issue of material fact exists if the respondent produces more than a scintilla of evidence for each challenged element. *Ridgway*, 135 S.W.3d at 600. Evidence is more than a scintilla where it "would enable reasonable and fair-minded jurors to differ in their conclusions." *Hamilton*, 249 S.W.3d at 426; *see King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Conversely, "[l]ess than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact." *Nalle Plastics Family Ltd. P'ship v. Porter, Rogers, Dahlman & Gordon, P.C.*, 406 S.W.3d 186, 199 (Tex. App.—Corpus Christi 2013, pet. denied) (internal quotation marks omitted). Just as with a directed verdict, we view "the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Tamez,* 206 S.W.3d at 582.

In a traditional motion, the movant has the burden to show both that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Knott*, 128 S.W.3d at 216. We take as true all evidence that is

favorable to the respondent, and indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Knott*, 128 S.W.3d at 215. A defendant moving for traditional summary judgment has the burden to conclusively disprove at least one of the essential elements of the plaintiff's cause of action. *Little v. Tex. Dep't. of Criminal Justice*, 148 S.W.3d 374, 381 (Tex. 2004). If the defendant's ground for summary judgment is an affirmative defense, the defendant must conclusively establish each element of that defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008) (per curiam) (holding that a defendant moving for summary judgment on an affirmative defense has burden to "conclusively establish" each element of its defense); *Lam v. Phuong Nguyen*, 335 S.W.3d 786, 789 (Tex. App.—Dallas 2011, pet. denied) (same). Once the movant shows that it is entitled to summary judgment, the burden shifts to the respondent to produce evidence that raises a genuine issue of material fact so as to avoid summary judgment. TEX. R. CIV. P. 166a(c); *Rotating Servs. Indus., Inc. v. Harris*, 245 S.W.3d 476, 487 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

### III. ISSUE ONE—BREACH OF CONTRACT (REAP)

#### A. Applicable Law

The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; (4) the plaintiff sustained damages as a result of the breach. *Sauceda v. GMAC Mtg. Corp.*, 268 S.W.3d 135, 140 (Tex. App.—Corpus Christi 2008, no pet.). REAP's motion for summary judgment addressed only the element of breach.

#### B. Appellant's Allegations

Appellant first asserted that REAP breached its contract with appellant in three

ways. First, REAP allegedly terminated appellant based on "clinic losses," which is a measure of losses the Contract does not contemplate for purposes of termination without cause. Appellant also asserts that the term "practice losses," the measure of losses referenced in the Contract, is ambiguous and that determining the meaning of the term and the extent of appellant's practice losses, if any, is therefore a fact issue for the jury.

Second, appellant argued that the minutes of the Board meeting indicated that the only information the Board had before it regarding appellant's losses (of any sort) was from 2008 and 2009, while the Contract only permitted termination at the end of a contract year for "annual" losses. Appellant interprets this term as referring to the losses incurred during the just-completed year, meaning that he could only be terminated for "practice losses" accumulated at the end of that year of the Contract. According to appellant, because the Board voted to terminate appellant with several months remaining in the third contract year, appellant's "practice losses," if any, could not have been calculated at the time of the meeting.[9]

Third, appellant argues that the Board represented to appellant that he was terminated without cause even though the Board allegedly considered appellant's supposedly continuing "behavioral problems" at the meeting in which it voted to terminate appellant's employment. Two PSC employees later filled out a "Personnel Action Form" to reflect "unsatisfactory performance" as the reason for termination. Appellant argues that the language on the form contradicts the representations in the termination letter that he was terminated without cause. Because he was terminated for cause, REAP breached

---

[9] Appellant maintains on appeal that he was terminated on the date of the vote, but he does not contest that he continued to receive his salary and all the other benefits of his position until the Board actually informed him of the termination via letter after the end of the third contract year.

11

the Contract by not affording him those protections before terminating his employment. According to appellant, REAP represented that he was terminated without cause to avoid affording him certain due process protections that the Contract provided must be followed in the event of termination for cause.[10]

### C. REAP's Traditional Motion for Summary Judgment

REAP argued two theories in support of its argument that it conclusively demonstrated that it did not breach the Contract. First, the term "practice losses" is unambiguous and the references to "clinic losses" were unintentional mistakes that clearly and unambiguously referred to "practice losses." REAP argued that it showed appellant's practice losses exceeded the $500,000 contractual threshold both at the time that the Board voted to terminate appellant's contract and in June of 2010, when the Board informed appellant of the decision to terminate his employment. *See Mary Kay Inc. v. Woolf*, 146 S.W.3d 813, 819 (Tex. App.—Dallas 2004, pet. denied) ("There can be no breach of contract when the manner of termination of the relationship is the manner contemplated by the contract's own terms."). Second, REAP alleged that prior to termination, appellant committed a material breach of the contract that excused REAP from further performance of the Contract. *See Mustang Pipeline Co., Inc. v. Driver*

---

[10] Appellant also asserts on appeal that REAP was required by law to follow certain due process procedures whether he was terminated for cause or without cause. Appellant argues that the Contract expressly incorporated the Texas Medical Board's regulations that require non-profit organizations such as REAP to afford all physicians due process procedures prior to termination. *See* 22 TEX. ADMIN. CODE § 177.4(2)(F) (West, Westlaw through 39 TEX. REG. 7830 (Sept. 26, 2014)). However, the first time appellant first raised this issue was in his motion for new trial. The respondent in a summary judgment proceeding may not seek to raise a fact issue in a motion for new trial unless the motion is based on newly discovered evidence that was not available at the time the trial court ruled on the motion. *See Risner v. McDonald's Corp.*, 18 S.W.3d 903, 908 (Tex. App.—Beaumont 2000, pet. denied). Appellant did not present this argument to the trial court in the response to the summary judgment motion, and we may not overturn summary judgment on a basis not expressly presented to the trial court in written response or other answer. TEX. R. CIV. P. 166a(c); *Brookshire Katy Drainage Dist. v. Lily Gardens, LLC*, 333 S.W.3d 301, 307 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

*Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) (observing that the material breach of one party to a contract discharges or excuses the other party from further performance on the contract).

### D. Discussion

We begin our discussion with the general rule that our goal in construing a contract is to ascertain the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). To achieve this goal "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

Regarding REAP's first ground for summary judgment, we are not convinced that REAP conclusively showed that there is no genuine issue of material fact regarding whether it breached the contract. *See Little,* 148 S.W.3d at 381. Assuming without deciding that REAP is correct that the contractual term "practice losses" is unambiguous and that appellant's "practice losses" exceeded the contractual threshold at all relevant times, REAP has established, at most, that the contractual conditions for termination without cause were met at the time of the meeting where the Board voted to terminate appellant. REAP's motion did not address appellant's contention that REAP actually terminated appellant for cause.[11] The distinction matters because the express language of the Contract required REAP to afford appellant certain due process procedures if it

---

[11] REAP makes several arguments on appeal regarding why the Board clearly voted to terminate appellant without cause and at a time permitted by the Contract, but we may not address any of them because REAP did not present them to the trial court in its motion. We may not uphold summary judgment on a ground that was not presented to the trial court in the motion for summary judgment. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993); *Mercier v. Sw. Bell Yellow Pages, Inc.*, 214 S.W.3d 770, 774 (Tex. App.—Corpus Christi 2007, no pet.); *see* TEX. R. CIV. P. 166a(c).

sought to terminate appellant for cause but did not require the same if REAP sought to terminate appellant without cause. To uphold summary judgment for REAP without REAP having first established on which grounds it terminated appellant would effectively require us to read that language out of the Contract. We must adopt a reading of the Contract that gives effect to all of its provisions if at all possible, and we see no reason not to do so here. *See Italian Cowboy Partners,* 341 S.W.3d at 333; *J.M. Davidson*, 128 S.W.3d at 229.

REAP argues that it was nevertheless entitled to summary judgment on appellant's entire claim because REAP established that it terminated his employment in a way that was envisioned by the Contract, and "[i]n the absence of fraud, a contract that authorizes cancellation without penalty will be enforced as it is written." *Tiger Truck, LLC v. Bruce's Pulp & Paper, LLC*, 282 S.W.3d 176, 183–34 (Tex. App.—Beaumont 2009, no pet.); *see Mary Kay*, 146 S.W.3d at 819. However, the contract at issue in this case does not authorize termination without penalty.[12] Here, the contractual language expressly distinguishes between different grounds for termination and provides different procedures that must be followed depending on the ground. As we already explained, we may not read that language out of the Contract. *See Italian Cowboy Partners,* 341 S.W.3d at 333; *J.M. Davidson*, 128 S.W.3d at 229. Because REAP did not conclusively establish the grounds on which it terminated appellant's employment, the trial court could not have properly granted summary judgment on this ground.

---

[12] *Mary Kay* is inapplicable because it addressed a dispute over Woolf's status as an independent contractor or an employee. *Mary Kay Inc. v. Woolf*, 146 S.W.3d 813, 817 (Tex. App.—Dallas 2004, pet. denied). Woolf argued the contractual provision permitting either party to terminate the agreement after thirty days' notice was evidence that she was an employee rather than an independent contractor. *Id.* at 819. The court of appeals held that provision could not overcome the other evidence from the contract indicating that Woolf was an independent contractor. *Id.*

14

REAP's second ground for summary judgment was that appellant committed a material breach of the Contract that excused REAP from further performance. *See Mustang Pipeline Co.,* 134 S.W.3d at 196; *see also Chau*, 254 S.W.3d at 455 (holding that a defendant moving for summary judgment on an affirmative defense has the burden to "conclusively establish" each element of the defense). REAP asserted that appellant agreed to abide by the Hospital's Code of Conduct (the Code), and that he breached the provision of the Code where he agreed that he "must not use the organization's electronic media to distribute or transmit any threatening, malicious, false, or obscene materials."[13] According to REAP, on December 28, 2008, appellant sent an email from his work computer to a retired cardiologist in Dallas containing fifty pictures of naked Playboy centerfolds. On May 6, 2009, appellant sent another email from his work computer to forty-one recipients that contained a picture of male genitalia.[14] One of the recipients was a nurse in appellant's office. On April 3, 2010, appellant sent an email from his work computer to a female nurse in Dallas which contained a pornographic video of an actress performing oral sex on a male actor. Appellant admitted in his deposition in response to a question that the emails were "obscene." Appellant also admitted during his deposition that he sent similar emails from his work computer throughout his time at the Hospital. On appeal, appellant characterizes the emails as "off-color jokes." REAP asserts that

---

[13] Appellant expressly agreed in the Contract that he: read the Code prior to executing the Contract; would comply with the Code; knew that compliance was "an integral and essential requirement of" the Contract; and knew that failure to comply with the Code would result in "disciplinary action" that could include termination.

[14] The exhibit REAP references is an email with the following text, which we reproduce in whole: "My wife was always after me to go shopping with her. Then I began wearing my favorite shirt . . . She doesn't want me to go shopping with her anymore." Below the text is a picture of a person wearing a shirt that displays an image of a penis that is designed to appear as if it is coming out of the top of the wearer's pants.

15

appellant's agreement shows that REAP conclusively established that there is no question of fact that appellant materially breached the Contract.

Appellant argues that even if appellant's conduct was a material breach, the Contract still required REAP to afford appellant certain due process procedures before terminating his employment for cause.  REAP replies that this argument is circular because REAP did not discover the breach until it demanded that appellant return his work computer after appellant filed this lawsuit.[15]

Assuming without deciding that the emails appellant sent through his work computer did breach the Contract, we conclude that REAP provided no evidence that the breach was material.  *See Mustang Pipeline Co.,* 134 S.W.3d at 198 (observing that a party is only released from performance if it can show both a breach and that the breach was material).  Texas courts have adopted the Restatement factors for determining whether a breach is material:  (1) the extent to which the injured party will be deprived of the benefit which the injured party reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of the benefit of which the injured party will be deprived;  (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;  (4) the likelihood that the party failing to perform or to offer to perform will cure the failure, taking into account of the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.  *Id.* at 199.  The first consideration is the most important, and "the less the non-breaching party is deprived of the expected benefit, the less material the breach."  *Hernandez v. Gulf Group Lloyds*,

---

[15] Appellant testified at his deposition that he mistakenly took the CPU of his work computer with him when he moved the furniture out of his offices at the Hospital.

16

875 S.W.2d 691, 693 (Tex. 1994); *see Crump v. Frenk*, 404 S.W.3d 146, 151 n.7 (Tex. App.—Texarkana 2013, no pet.) (citing *Hernandez* and observing that "whether a breach is material hinges in large part upon whether, as a result of the breach, the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance").

In this case, REAP does not attempt to show the nature of the benefit appellant's emails deprived them. *See Hernandez*, 875 S.W.2d at 693; *Crump*, 404 S.W.3d at 151 n.7. Moreover, REAP did not even discover the breach until after REAP terminated appellant's contract, appellant filed the lawsuit that is the subject of this appeal, and REAP's counsel demanded the return of appellant's work computer. Because REAP did not establish that appellant's emails deprived it of a benefit it expected under the Contract, we conclude that REAP cannot show that the breach was material. *See Hernandez*, 875 S.W.2d at 693; *Crump*, 404 S.W.3d at 151 n.7; *see also Action Bail Bonds v. Vela*, No. 13-13-00015-CV, 2013 WL 6730047, at *6 (Tex. App.—Corpus Christi Dec. 19, 2013, no pet.) (mem. op.) (holding that appellants could not survive summary judgment on their material breach affirmative defense because they showed no evidence "they were or could be deprived of an expected benefit of the collateral agreement" once the other party's case had been dismissed). Because REAP has not conclusively established that appellant committed a material breach, summary judgment for REAP was not appropriate on this basis. *See Hernandez*, 875 S.W.2d at 693; *Crump*, 404 S.W.2d at 151 n.7; *see also Action Bail Bonds*, 2013 WL 6730047, at *6.

In sum, we conclude that summary judgment for REAP was improper because REAP's traditional motion for summary judgment did not conclusively establish that it did

17

not breach the Contract. *See Little,* 148 S.W.3d at 381. We also conclude that REAP failed to establish that appellant committed a material breach. *See Hernandez*, 875 S.W.2d at 693; *see also Action Bail Bonds*, 2013 WL 6730047, at *6. We accordingly sustain appellant's first issue.

### IV. Issue Two—Business Disparagement (Jackson, Hospital, and PSC)

By his second issue, appellant argues that the trial court erred when it granted traditional and no-evidence summary judgments in favor of the Hospital, Jackson (collectively, "Jackson"), and PSC on appellant's claims for business disparagement.

#### A. Applicable Law

A plaintiff asserting business disparagement must prove: (1) the defendant published false and disparaging information about the plaintiff; (2) with malice; (3) without privilege; and (4) the plaintiff suffered special damages as a result. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003); *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 82 (Tex. 2000). Business disparagement is both a means of tortiously interfering with a contract and an independent tort. *Prudential Ins. Co.*, 29 S.W.3d at 82.

A claim for business disparagement is similar in many respects to a claim for defamation, except that business disparagement protects the plaintiff's specifically economic interests. *Forbes*, 124 S.W.3d at 170. The law also imposes three more stringent pleading requirements on a plaintiff asserting business disparagement: "falsity of the statement, fault of the defendant and proof of damage." *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987) (internal quotation marks omitted). Regarding falsity, the plaintiff must show that the statements at issue are false and disparaging

18

because only defamatory statements are actionable as business disparagement. *Prudential Ins. Co.*, 29 S.W.3d at 82; *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 728 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Regarding fault, a defendant may be held liable only if he "knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." *Forbes*, 124 S.W.3d at 170; *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 87 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (op. on reh'g). Regarding damages, the plaintiff must prove special damages, which in this case means that "the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 628 (Tex. App.—Fort Worth 2007, pet. denied).

### B. Discussion

#### 1. The Hospital and Jackson

Appellant asserted that Jackson, acting as an agent of the Hospital, "intentionally and knowingly" communicated two false and disparaging statements to the Board: (1) that appellant could be terminated for the "clinic losses," instead of "practice losses," and for years other than the third year of the Contract; and (2) that appellant was still exhibiting "behavioral problems" by continuing to refuse to take referrals from the two BCS Heart cardiologists. Jackson's no-evidence motion challenged whether appellant could produce evidence raising an issue of material issue of fact on any element of business disparagement. *See* TEX. R. CIV. P. 166a(i).

19

We first address whether appellant successfully raised a material issue of fact on whether the statements were false and disparaging. Whether a statement is capable of a defamatory meaning is initially a question of law for the court. *Turner v. KTRK Tel., Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). A statement is defamatory if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013); *see Allied Mktg. Grp., Inc., v. Paramount Pictures Corp.*, 111 S.W.3d 168, 176 (Tex. App.—Eastland 2003, pet. denied) (observing, in a business-disparagement case, that a statement is defamatory if it "would ordinarily tend to injure a plaintiff's business reputation, resulting in financial injury"). We determine whether a statement is defamatory by construing the statements as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the statements. *Turner*, 38 S.W.3d at 114. A statement may be "false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances." *MKC Energy Inv., Inc. v. Sheldon*, 182 S.W.3d 372, 377 (Tex. App.—Beaumont 2005, no pet.).

Taking Jackson's statements to the Board as a whole, we conclude that appellant failed to raise an issue of material fact regarding whether Jackson's statements were defamatory. Appellant argues that Jackson misrepresented the Contract's provisions on termination without cause[16] and falsely told the Board that appellant was still refusing to

---

[16] On appeal, Jackson interprets appellant as arguing that Jackson's representations regarding the dollar amounts of his "clinic losses" for 2008 and 2009 were false. However, appellant specifically argued in this section of his brief that Jackson's statements were false because the "[C]ontract could not be terminated based on 'clinic losses' for the years 2008 and 2009. The 'without cause' provisions of the contract, of which Jackson had specific knowledge, expressly provide[d] that the contract could only be terminated, without cause, for annual 'practice losses' as calculated for year three" of the Contract. We interpret this language as challenging Jackson's representations regarding the contractual provisions on

20

accept patient referrals from the two BCS Heart cardiologists. But, even if we accept that Jackson was wrong about the Contract's provisions on termination without cause, a reasonable listener would not have interpreted statements incorrectly describing contractual provisions as affecting appellant's "business reputation," negatively or otherwise.[17] *See Neely*, 418 S.W.3d at 60; *Allied Mktg. Grp.*, 111 S.W.3d at 176. Regarding the statement on appellant's behavioral problems, both appellant and Jackson agree that Jackson told the Board that appellant's behavioral problems were "ongoing." Appellant thus had the burden to produce more than a scintilla of evidence that he was no longer refusing to see patients referred by the two cardiologists at the time of the Board meeting in February of 2009, where the Board voted to terminate appellant. Appellant argues that he met this burden because Jackson admitted in his deposition that the dispute was resolved after a second meeting between appellant and the two BCS Heart cardiologists in December of 2009. However, Jackson testified only that appellant and the BCS Heart doctors agreed to resume working together at the December of 2009 meeting. At that time, the agreement was that all of them would publish some sort of affirmation of appellant's skills as a surgeon after a "few months" of working together again.[18] In none of the excerpts from Jackson's deposition that are in the record does he

---

termination without cause rather than the truth of the dollar amounts of the "clinic losses" presented to the Board.

[17] We reiterate that appellant does not argue that the amount of the "clinic losses" conveyed to the Board is disparaging, but rather the representation that he could be terminated for "clinic losses" at all. Appellant specifically argues in his brief that the statements were disparaging because: "[a]s discussed in detail, *supra*, [appellant's] contract could not be terminated based on 'clinic losses' for the years 2008 and 2009. The 'without cause' provisions of the contract, of which Jackson had specific personal knowledge, expressly provides that the contract can only be terminated, without case, for annual 'practice losses' as calculated for year three" of the Contract.

[18] Jackson specifically testified that the cardiologists agreed that they:

would work together for a few months. It was December, so they said the spring, and they would do some joint marketing together. Whether it be a marketing affirmation or

21

discuss the status of the dispute at or around the time of the February Board meeting. Appellant directs us to no other evidence that raises an issue of fact as to whether Jackson's statements were false.[19] This evidence is no more than a mere scintilla of evidence that Jackson's statements were false. *See Nalle Plastics*, 406 S.W.3d at 199. Having concluded that there was not sufficient evidence of one the elements of appellant's claim for business disparagement, we need not address the other elements. *See* TEX. R. APP. P. 47.1. We hold that the trial court did not err in granting no-evidence summary judgment for Jackson and the Hospital on appellant's claims for business disparagement. *See Hamilton*, 249 S.W.3d at 426; *Tamez*, 206 S.W.3d at 582.

## 2. PSC

PSC's no-evidence motion for summary judgment specifically challenged the evidence supporting each essential element of a claim for business disparagement.

Appellant argues that the following statements or omissions by PSC employees Les Luke and Ashley Bosshart, taken together, constitute business disparagement: Luke's statements to the Board at the November 19, 2009 meeting that we reproduced above; the failure of Luke and Bosshart to advise the Board that appellant wanted to speak to them concerning his dispute with the two cardiologists; Bosshart's email to the Board reminding them of the agenda of the meeting; and the completion of the "personnel action form" and its placement in appellant's personnel file with both the Hospital and PSC.

---

something that would meet [appellant's] expectations, they would do something together after they worked together for a while.

[19] Appellant argues that Bosshart's email to the REAP Board and the REAP Board minutes showed that Jackson knew that these statements were false, but appellant cites only to the statements themselves. He does not direct us to any evidence of falsity.

22

We address the element of malice first because it is dispositive. For these purposes, a party acts with malice in publishing false statements if the party "knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." *Hurlbut*, 749 S.W.2d at 766; *see Newspaper Holdings*, 416 S.W.3d at 87. In this case, appellant specifically alleged that Luke and Bosshart knew the statements were false and misleading when they published them to the Board.[20] Appellant argues on appeal that he raised a fact issue regarding whether Luke and Bosshart made these statements with the required mental state because he demonstrated that Luke had wanted to terminate appellant's employment since at least February of 2009, the time when Luke sent the letter to Jackson recommending termination. According to appellant, all of Luke's conduct after that date was part of his plan to terminate appellant's employment.

Viewing the evidence in the light most favorable to appellant, we conclude that appellant has not produced evidence raising a fact issue regarding whether Luke and Bosshart acted with malice. We agree that appellant has produced some evidence that he did perform some surgeries (other than the single emergency surgery) on patients referred by Dr. Miller, the third BCS Heart cardiologist, and thus raised an issue that Luke's statements that appellant "had not worked since September" were false in that respect. However, even assuming that these statements were not substantially true,

---

[20] We note that apart from a reference to the fact that Luke was "angry at [appellant] and intended to cause him harm by publishing these false statements," appellant alleged only that Luke and Bosshart acted with actual malice, i.e., that they knew the statements were false or were reckless as to their truth at the time they made them. Because both parties agree that the "actual malice" standard applies, we will evaluate appellant's claim under the standard. *See Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170–71 (Tex. 2003) (applying the actual malice standard to a business-disparagement claim brought by a public figure against a media defendant where neither side contested the applicability of that standard to the case).

23

appellant's evidence does not raise an issue of fact that Luke and Bosshart knew the statements were false at the time they made them.  To reach the level of actual malice, it is not enough that the speaker be mistaken as to the truth of the statements, even negligently so.  *Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 855 (Tex. 2005).  The speaker must make the statements either with knowledge of their falsity "or in circumstances so improbable that only a reckless publisher would have made the mistake."  *Id.*  Appellant does not explain how the mere fact that Luke made the statements appellant cites at a time after Luke recommended terminating appellant's employment shows that Luke knew the statements were false.  *See id.* at 858 (observing that evidence of the defendant's "ill will or desire to injure" is not evidence of actual malice); *Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 424–25 (Tex. 2000) (same).  Similarly, the mere fact that Bosshart and Luke filled out the "personnel action form" to reflect "unsatisfactory performance" also does not establish that they knew this statement was false.  *See Cantu*, 168 S.W.3d at 858.  Regarding Bosshart's email to the Board to set up the conference call, appellant presented no evidence that Bosshart knew of the statements' falsity, was reckless regarding the truth of the statements, or that the email did anything but remind the Board of the statements Jackson already made regarding termination.[21]  We hold that this evidence is no more than a mere scintilla of evidence supporting the element of malice.  *See Nalle Plastics*, 406 S.W.3d at 199.  Having concluded that there was not sufficient evidence of one the elements of appellant's claim for business disparagement, we need not address the other elements.

---

[21] Appellant's brief points out that Bosshart's email used the term "current" where Jackson used the term "continuing" to describe appellant's "behavioral issues," and used the term "high" to describe appellant's losses, but does not explain how this shows that her email did anything other than summarize Jackson's statements.

*See* TEX. R. APP. P. 47.1.  We hold that the trial court did not err in granting PSC's no-evidence motion for summary judgment.  *See Hamilton*, 249 S.W.3d at 426; *Tamez*, 206 S.W.3d at 582.

### 3.  Summary

In summary, we hold that the trial court did not err in granting the no-evidence summary judgment for Jackson, the Hospital, and PSC on appellant's claim for business disparagement.  *See Hamilton*, 249 S.W.3d at 426.  Because no-evidence summary-judgment for Jackson, the Hospital, and PSC was appropriate, we need not review the merits of the motions for traditional summary judgment on this claim.  *See Ridgway*, 135 S.W.3d at 600.  We overrule appellant's second issue.

### V. ISSUE THREE—TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT

By his third issue, appellant challenges the trial court's traditional and no-evidence summary judgments on his claims against Jackson, the Hospital, and PSC for tortious interference with an existing contract.

### A.  Applicable Law

A plaintiff alleging tortious interference with an existing contract must prove the following elements:  (1) the existence of a contract subject to interference; (2) a willful and intentional act that interfered with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damage or loss to the plaintiff.  *Prudential Ins. Co.*, 29 S.W.3d at 77.

Regarding the "willful and intentional interference" prong, the plaintiff must produce some evidence of a willful act of interference by the defendant.  *SJW Prop. Commerce, Inc. v. Sw. Pinnacle Props., Inc.*, 328 S.W.3d 121, 150 (Tex. App.—Corpus Christi 2010,

25

pet. denied) (op. on reh'g) (citing *Browning-Ferris, Inc., v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993)). The defendant must have been "more than a willing participant; he must knowingly induce one of the contracting parties to breach its obligations." *Id.* at 152. In the words of the Austin Court: "[a] necessary element of the plaintiff's cause of action is a showing that the defendant took an active part in persuading a party to a contract to breach it." *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 731 (Tex. App.—Austin 2000, pet. denied).

The mere fact that a contract may be terminated at will or terminated with notice is generally not a defense to a claim for tortious interference. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666 (Tex. 1990) (terminable-with-notice contract); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989) (terminable-at-will contract). However, the protection provided by the holdings of those cases is limited because the Supreme Court of Texas has also held that a party cannot be held liable for inducing another party "to do what it had a right to do" under the contract. *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *see AKB Hendrick, LP v. Musgrave Enterps., Inc.*, 380 S.W.3d 221, 236 (Tex. App.—Dallas 2012, no pet.). Thus, "merely inducing one of the parties to exercise his right to terminate contractual relations after giving the required notice does not necessarily constitute tortious interference with contract under Texas law." *Faucette v. Chantos*, 322 S.W.3d 901, 914 (Tex. App.— Houston [14th Dist.] 2010, no pet.).

Regarding the causation prong of the analysis, we apply the classic proximate-cause tests for cause-in-fact and foreseeability. *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Hill*

26

*v. Heritage Res., Inc.*, 964 S.W.2d 89, 126 (Tex. App.—El Paso 1997, pet. denied). The cause-in-fact test requires the plaintiff to show that the interference was a "substantial factor" in bringing about the injury without which the injury would not have occurred. *Richardson-Eagle*, 213 S.W.3d at 474.

Regarding the "actual loss" prong of the analysis, damages for tortious interference with an existing contract are the same as the measure of damages for breach of contract: damages sufficient to put the plaintiff in the same position as if the contract had been fully performed. *Am. Nat. Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990); *Palla v. Bio-One, Inc.*, 424 S.W.3d 722, 726 (Tex. App.—Dallas 2014, no pet.).

Even if a plaintiff is able to establish these elements, a defendant may still avoid liability by asserting the affirmative defense of justification. *Prudential Ins. Co.*, 29 S.W.3d at 77–78. A defendant may show the interference was justified if it "was done in a bona fide exercise of [the interferer's] rights or that the interferer has an equal or superior right in the subject matter to that of the other party." *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 215 (Tex. 1996) (internal citations omitted, alterations in the original). The defense of exercising a legal right can be based on either: (1) a bona fide exercise of the defendant's own legal rights, or (2) a good faith claim to a colorable legal right that eventually turns out to be mistaken. *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 77 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

If the trial court finds as a matter of law that the defendant had the legal right to interfere with a contract, then the defense is established and the defendant's motive is irrelevant. *Prudential Ins. Co.*, 29 S.W.3d at 80. Alternatively, a defendant who fails to

establish justification as a matter of law can still avoid liability if: (1) the trial court determines that the defendant interfered while exercising a colorable legal right; and (2) the jury finds that the defendant exercised that colorable right in good faith. *Tex. Beef Cattle Co.*, 921 S.W.2d at 211. If the trial court determines that the defendant was exercising a colorable legal right, determining whether the defendant acted in good faith under the second prong is a jury question. *Id.*; *see Gulf Liquids*, 356 S.W.3d at 77.

### B. Discussion

#### 1. The Hospital and Jackson

##### a. No-Evidence Motion

By their no-evidence motion, Jackson and the Hospital challenged the evidence supporting the essential elements of willful and intentional interference, causation, and actual loss.

We begin with the element of a willful and intentional act of interference. Appellant had the burden to produce evidence raising a genuine issue of fact regarding whether Jackson knowingly induced REAP to breach its contract with appellant. *See SJW Prop.*, 328 S.W.3d at 152. Appellant argues that Jackson interfered with the Contract by misrepresenting its terms regarding termination and by falsely informing the Board that appellant's dispute with the cardiologists was ongoing. Jackson does not contest that he "intentionally" induced REAP to terminate the Contract, but responds that: (1) appellant has not raised an issue of material fact on whether Jackson acted entirely out of his own interests, and (2) Jackson merely induced REAP to do what it had the right to do under the Contract. *See ACS Invs.*, 943 S.W.2d at 430.

We first address the argument that appellant was required to produce evidence

28

raising an issue of material fact regarding whether Jackson acted entirely out of his own interests and not the Hospital's. The general rule is that a corporate agent cannot be held liable for tortious interference with the principal's contract as long as the agent acted in good faith on the principal's behalf. *Id.* at 432. Thus, a plaintiff suing a corporate agent for tortious interference must prove that the agent acted solely to further the agent's personal interests "so as to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract." *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003) (per curiam) (internal quotations marks omitted). Jackson reasons that because he was an agent of both REAP and the Hospital, appellant had to raise a genuine issue of fact that Jackson acted entirely out of his own interests but that appellant failed to do so. We agree that Jackson acted as an agent of REAP for the purposes of drawing up suggested terms for appellant's employment contract.[22] However, the minutes of the meeting in which the Board terminated appellant recite that "Thomas Jackson, Chief Executive Office[r] of [the Hospital]" made the Hospital's request to REAP to terminate appellant. One of Bosshart's emails to the Board referred to Jackson as "the CEO of the [Hospital]." We find no indication that Jackson acted as REAP's agent when he requested the termination or for any purpose other than negotiating appellant's contract with REAP. We accordingly reject Jackson's argument that appellant was required to raise a genuine issue of material fact on whether Jackson acted entirely out of his own interests and not in good faith on behalf of the Hospital.

We turn next to the argument of the Hospital and Jackson (collectively, "Jackson")

---

[22] Jackson testified at his deposition that part of his duties as CEO of the Hospital is to suggest terms on which physicians would be hired by REAP, and that he acted as REAP's agent for this purpose. Jackson was not separately compensated by REAP for this role.

that there is no evidence that he tortiously interfered in the Contract because he merely induced REAP to exercise its contractual right to terminate appellant without cause as the Contract permitted. *See ACS Invs.*, 943 S.W.2d at 430. In other words, Jackson's actions cannot be tortious because REAP did not breach its contractual obligations. However, appellant produced evidence that Jackson requested the Board to terminate appellant for "clinic losses," while the contractual language does not contemplate termination for "clinic losses." Jackson does not attempt to rebut appellant's evidence by showing that "clinic losses" are the same as the "practice losses" mentioned in the Contract or that the term "practice losses" is unambiguous. By presenting evidence that Jackson requested the termination and explained the reasons for it, we conclude that appellant produced more than a scintilla of evidence supporting the element of an intentional act of interference. *See SJW Prop.*, 328 S.W.3d at 152; *Randalls Food Mkts.,* 17 S.W.3d at 731. Therefore, summary judgment could not be properly granted on this basis.

We next address the element of causation. *See Prudential Ins. Co.*, 29 S.W.3d at 77. Appellant had the burden to produce some evidence raising an issue of fact on whether Jackson's acts or omissions were a substantial factor in bringing about his injury without which the harm would not have occurred. *See Richardson-Eagle*, 213 S.W.3d at 474. Jackson argues that appellant did not carry this burden because he did not present testimony from members of the Board on the reason for their vote or introduce into evidence any official REAP documents establishing that the Board terminated appellant because of Jackson's statements. Appellant responds that he met this burden by showing that Jackson requested that REAP terminate appellant's employment and explained the Hospital's reasons for making the request.

30

Jackson's brief cites the rule that "[p]roximate cause cannot be satisfied by mere conjecture, guess, or speculation," *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008), and argues that appellant's evidence is nothing more than such conjecture without testimony from Board members or documents from REAP explaining the official reason for the termination. However, appellant was only required to produce more than a scintilla of evidence that would allow reasonable people to conclude that Jackson's actions were a proximate cause of the injury. *See Hamilton*, 249 S.W.3d at 426. And it is uncontested that Jackson requested that the Board terminate appellant's contract and explained the reasons behind that request. Jackson does not direct us to any case law requiring that a specific type of evidence is needed to raise a fact issue on proximate cause, and we have found none. Circumstantial evidence will suffice so long as it is more than "conjecture, guess, or speculation." Viewing the foregoing evidence in the light most favorable to appellant as we must, we hold that appellant produced more than a scintilla of evidence supporting the essential element of causation. *See Richardson-Eagle*, 213 S.W.3d at 474; *Hill*, 964 S.W.2d at 126. Therefore, summary judgment could not be properly granted on this basis.

We next turn to the element of damages. Jackson challenged this element of appellant's claim in the no-evidence motion for summary judgment, but Jackson did not address it in his brief on appeal. Appellant nevertheless had the burden to produce evidence raising a material issue of fact that he suffered "actual damage or loss." *See Prudential Ins. Co.*, 29 S.W.3d at 77. Appellant produced uncontested evidence that if his employment had not been terminated he would have received approximately $1,500,000 in base salary for the remainder of the contractual term, plus his annual

31

$100,000 directorship fee and the monetary value of the other benefits he was entitled to under the Contract. Because appellant showed approximately the amount of money that he would have received if the Contract was fully performed, we agree that appellant produced more than a scintilla of evidence on the essential element of damages. *See Am. Nat. Petroleum Co.*, 798 S.W.2d at 278; *Palla*, 424 S.W.3d at 726. Therefore, summary judgment could not be granted on this basis.

### b. Traditional Motion

Having concluded that appellant successfully carried his burden to produce evidence raising a genuine issue of material fact on all the challenged elements of his claim, we turn now to Jackson's traditional motion for summary judgment. *See* TEX. R. CIV. P. 166a(c). We first address whether Jackson moved for summary judgment on this cause of action, and we conclude that the trial court erred by granting summary judgment on a claim that was not addressed in the motion.

The general rule is that it is reversible error for a trial court to grant summary judgment on a new claim that the movant did not address in the motion. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam); *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 200 & n.49 (Tex. 2001). The source of this law is Rule 166a(c), which requires a traditional motion for summary judgment "to state the specific grounds therefor." TEX. R. CIV. P. 166a(c); *see Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 436 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The courts of appeals have recognized three limited circumstances in which reversal is not necessary: (1) if a claim in an amended petition essentially reiterates a previously pleaded cause of action; (2) if a ground asserted in the motion conclusively negates an element common to the new and previously pleaded

32

claims; or (3) if the original motion is "broad enough" to encompass the newly asserted claims. *Coterill-Jenkins v. Tex. Med. Ass'n Health Care Liab. Claim Trust*, 383 S.W.3d 581, 592 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *Rotating Servs.*, 245 S.W.3d at 487. However, if a plaintiff "asserts a new cause of action based on facts not alleged in the original petition, a court cannot say the defendant's motion for summary judgment contemplated and embraced the additional claim in the amended petition."[23] *Espeche v. Ritzell*, 123 S.W.3d 657, 664 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *accord DeWoody v. Rippley*, 951 S.W.2d 935, 942 (Tex. App.—Fort Worth 1997, writ dismissed by agreement) (holding that summary judgment was improper on causes of action not addressed in the motion and based on facts not originally pleaded).

At the time Jackson moved for summary judgment, appellant's Fourth Amended Petition was still his live petition. In that petition, appellant alleged that Jackson, Dr. Lechin, and Dr. Lammoglia tortiously interfered with his contract with REAP by jointly working to drive up his losses to the Hospital and cause his termination. The two cardiologists allegedly did this by refusing to refer patients needing surgery to appellant and by demanding that Jackson instruct appellant that he could no longer conduct a clinic

---

[23] We addressed the merits of Jackson's no-evidence motion on this same claim because a no-evidence motion is generally "broad enough" to encompass new factual allegations so long as the respondent still asserts a claim with the same essential elements as those challenged in the no-evidence motion. *See Keszler v. Mem'l Med. Ctr. of E. Tex.*, 105 S.W.3d 122, 128–29 (Tex. App.—Corpus Christi 2003, no pet.)*; Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 436–37 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

For example, in *Lampasas*, after the defendant moved for no-evidence summary judgment, the plaintiff amended his petition to allege new variations on his multiple negligence claims. 988 S.W.2d at 437. The court of appeals held that the defendant's motion was broad enough to encompass the new variations on the claims because each still sounded in negligence and thus had the same essential elements challenged in the motion. *Id.* By contrast, in *Keszler*, where the plaintiff originally asserted a claim for breach of contract, this Court held that the no-evidence motion was not broad enough to encompass newly-asserted claims for fraud, slander, "constitutional deprivations" and violations of the Sherman Anti-Trust Act because those claims had different essential elements than a claim for breach of contract. 105 S.W.3d at 129.

in Buffalo, Texas, but had to spend all of his time at the Hospital.  As part of this plan, Jackson allegedly deliberately hired an associate cardiovascular surgeon to eventually replace appellant at a lesser salary.

After the trial court granted summary judgment in favor of the two cardiologists and REAP produced discovery that included the minutes of the meeting in which the Board voted to terminate appellant, appellant filed his Sixth Amended Petition.[24]  In this petition, appellant alleged that Jackson tortiously interfered with appellant's contract by making the statements to the Board that we discussed above.  Appellant did not reassert his original theory of tortious interference, and the new claim did not rely on any of the facts supporting the original theory.  On appeal, Jackson asserts that amending the motion was unnecessary because the Sixth Amended Petition reiterated the same cause of action but "with an alteration to the underlying facts."  We disagree.

In contrast to the cases appellant relies on,[25] the Sixth Amended Petition did not amend an already-existing cause of action by providing additional or alternative factual allegations.  Appellant's new claim for tortious interference arose from facts that were completely absent from his original and earlier amended petitions and did not have any facts in common with the original theory.  Appellant, in effect, pleaded a new cause of action for tortious interference.  *See Espeche*, 123 S.W.3d at 664; *DeWoody*, 951 S.W.2d at 942.  Because Jackson's motion did not address this cause of action, we hold that the trial court erred in granting summary judgment on it.  *See Nall*, 404 S.W.3d at 555;

---

[24] The Fifth Amended Petition continued to allege substantially the same theories as the Fourth Amended Petition.

[25] *See Larson v. Family Violence & Sexual Assault Prevention Ctr. of S. Tex.*, 64 S.W.3d 506, 510 n.2 (Tex. App.—Corpus Christi 2001, pet. denied); *see also Barth v. Royal Ins. Co.*, No. 13-02-00688-CV, 2004 WL 2904306, at *2 (Tex. App.—Corpus Christi Dec. 16, 2004, no pet.) (mem. op.).

*Lehmann*, 39 S.W.3d at 200.

Jackson further asserts that appellant's claim is barred by the affirmative defense of limitations. We may not consider this ground because Jackson raised it for the first time in a supplemental reply filed on the day of the hearing on the motions for summary judgment. A movant may not raise a new ground for summary judgment in a reply without the consent of the respondent, and Jackson does not argue that appellant consented. *ADT Sec. Servs., Inc. v. Van Peterson Fine Jewelers*, 390 S.W.3d 603, 606 (Tex. App.—Dallas 2012, no pet.); *Reliance Ins. Co. v. Hibdon*, 333 S.W.3d 364, 378 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *Garcia v. Garza*, 311 S.W.3d 28, 36 (Tex. App.—San Antonio 2010, pet. denied). We hold that we may not uphold summary judgment for Jackson on this ground because Jackson did not make this claim in a motion for summary judgment. *See* TEX. R. CIV. P. 166a(c) (providing that a motion for summary judgment must state the specific grounds); *see also Nall*, 404 S.W.3d at 555; *Lehmann*, 39 S.W.3d at 200.

### 2. PSC

#### a. No-Evidence Motion

PSC asserts on appeal that its no-evidence motion challenged the elements of intentional interference and damages. *See Prudential Ins. Co.*, 29 S.W.3d at 77. However, regarding the element of interference, PSC's no-evidence motion actually challenged whether appellant produced any evidence raising a material issue of fact that PSC "engaged in unlawful interference with the contract." Interference by an unlawful means is not an essential element of the tort of interference with an existing contract. *See SJW Prop.*, 328 S.W.3d at 152; *see also Faucette*, 322 S.W.3d at 914 (distinguishing

the interference required for tortious interference with prospective contracts, which must be "independently tortious or unlawful," with the elements of tortious interference with an existing contract). A motion under Rule 166a(i) must challenge the specific elements for which there is no evidence. *See* TEX. R. CIV. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). Because PSC's motion challenged the existence of evidence of "unlawful" interference, we conclude that PSC's motion did not specifically challenge the essential element of intentional interference. *See Timpte Indus.*, 286 S.W.3d at 310; *Johnson v. Felts*, 140 S.W.3d 702, 706 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (observing that when reviewing a no-evidence motion, "[a]n appellate court cannot read between the lines, infer or glean from the pleadings or proof any grounds for summary judgment other than those grounds expressly set forth before the trial court in the motion").

PSC's motion also challenged the evidence to support the essential element of damages, but PSC does not address this element in its brief on appeal. We conclude that appellant carried his burden on that element by showing the amount of money he would have received under the Contract if his employment had not been terminated. *See Am. Nat. Petroleum Co.*, 798 S.W.2d at 278; *Palla*, 424 S.W.3d at 726.

### b. Traditional Motion

Having concluded that appellant successfully produced more than a scintilla of evidence on all the elements challenged in PSC's no-evidence motion, we now address PSC's traditional motion. *See* TEX. R. CIV. P. 166a(c). PSC moved for traditional summary judgment on the grounds that it conclusively established: (1) it did not intentionally interfere with appellant's contract; (2) the affirmative defense of justification;

and (3) the affirmative defense of privilege based on truthful information.[26]  As a defendant moving for summary judgment, PSC had the burden to conclusively disprove at least one of the essential elements of the appellant's cause of action.  *Little*, 148 S.W.3d at 381. PSC also had the initial burden to conclusively establish each element of its affirmative defenses.  *See Chau*, 254 S.W.3d at 455; *Lam*, 335 S.W.3d at 789.  If PSC meets that burden, the burden shifts to the respondent to present evidence raising a genuine issue of material fact on one or more elements of the affirmative defense so as to preclude summary judgment.  *Id.*

We begin with PSC's assertion that traditional summary judgment was proper because it conclusively negated the element of willful and intentional interference.  PSC asserted in its motion that every statement appellant alleged as a basis for the claim was "made to advise REAP to take action expressly contemplated by the Contract."  According to the motion, it is undisputed that appellant's practice losses actually exceeded the $500,000 contractual threshold at the time of the meeting where the Board voted to terminate appellant.

---

[26] In its traditional motion for summary judgment on appellant's claim for business disparagement, PSC asserted that the claim was barred by a qualified privilege.  The privilege PSC raises is the privilege of an employer "that attaches to communications made in the course of an investigation following a report of employee wrongdoing."  *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).  The privilege remains so long as the communications "pass only to persons having an interest or duty in the matter to which the communications relate."  *Id.*; *see Henriquez v. Cemex Mgmt., Inc.*, 177 S.W.3d 241, 253 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (collecting cases).

We did not reach the privilege argument because we concluded that appellant did not raise a fact issue on the element of malice.  However, PSC now argues that the same qualified privilege bars appellant's claims for tortious interference because those claims are based on the same statements.  We reject this argument because even if we had reached PSC's traditional motion on appellant's claim for business disparagement, PSC's privilege argument would have failed.  The privilege in *Randall's Food Markets* and the other cases appellee cites attaches to communications by the employer to other persons, not communications by other people to the employer.  *See* 891 S.W.2d at 646; *Henriquez*, 177 S.W.3d at 253. In this case, REAP, and not PSC or the Hospital, was appellant's employer.  *See Gupta*, 140 S.W.3d at 752.

We hold that PSC has not conclusively negated that it willfully and intentionally interfered in the Contract. PSC asserted that the calculations it used to arrive at a figure for appellant's "practice losses" is uncontroverted. We agree, but only to the extent that appellant does not contest that if the revenue appellant brought in during the third contract year is subtracted from the expenses associated with his role at the Hospital, the resulting figure exceeds $500,000. However, PSC's motion for summary judgment did not attempt to establish that the meaning of the term "practice losses," as it is used in the Contract, is unambiguous. Moreover, Luke provided the Board with loss figures from the years 2008 and 2009. Appellant argues, and PSC does not contest, that appellant could only be terminated for losses sustained during the third contract year, which was not complete at the time the Board voted to terminate appellant.[27] In sum, because PSC has not established that it induced REAP to do what it had the right to do under the Contract, we conclude that PSC has not conclusively disproved the element of willful and intentional interference. *See Little*, 148 S.W.3d at 381.

We next turn to the affirmative defense of justification. *See Chau*, 254 S.W.3d at 455 (holding that a defendant moving for summary judgment on an affirmative defense has the burden to "conclusively establish" each element of the defense). As we explained above, a defendant proves the affirmative defense of justification by showing that the interference "was done in a bona fide exercise of [the interferer's] rights or that the interferer has an equal or superior right in the subject matter to that of the other party."

[27] However, we agree that Bosshart's email to the Board reminding them of the agenda for the meeting does not constitute actionable interference. Bosshart's email simply reminded them of the subject of the meeting, Jackson's request to terminate appellant, and Jackson's stated reasons for it. *See SJW Prop.*, 328 S.W.3d at 152 (observing that the element of intentional interference requires that the defendant "knowingly induce[s]" a contract party to break its contract).

38

*Tex. Beef Cattle Co.*, 921 S.W.2d at 215. A defendant generally establishes justification as a matter of law "when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Prudential Ins. Co.*, 29 S.W.3d at 81; *ACS Invs.*, 943 S.W.2d at 431. PSC asserted that it was justified as a matter of law because it had "the legal right to provide input and advice to the REAP Board regarding the employment of physicians," and because it only gave truthful information to the Board.

Regarding the first ground, we agree that the evidence is undisputed that PSC provided advice regarding the financial performance of physicians in Community Health Systems' hospitals. The evidence showed that Luke's role at PSC was to analyze the financial performance of physicians at hospitals owned by Community Health Systems and to make recommendations regarding their employment status, and this included making recommendations to the REAP Board. However PSC does not direct our attention to a contract or other basis of a legal right to interference except for stating generally that PSC had a business relationship with REAP.[28] *See Prudential Ins. Co.*, 29 S.W.3d at 81. We accordingly may not uphold summary judgment on this basis. *See id.*; *ACS Invs.*, 943 S.W.2d at 431.

Regarding the second ground, PSC asserts that it conclusively established the defense of privilege based on truthful information. Neither this Court, the transferor court,

---

[28] PSC's argument regarding its business relationship with REAP is more akin to the qualified privilege against defamation for statements "made in good faith on any subject matter in which the author has an interest, or with reference to which he has a duty to perform to another person having a corresponding interest or duty." *TRT Dev. Co.-KC v. Meyers*, 15 S.W.3d 281, 286 (Tex. App.—Corpus Christi 2000, no pet.). PSC asserts this argument on appeal, but it is not included in its motion for summary judgment. Even if we assume that a privilege against a claim for defamation is applicable in this context, we may not uphold summary judgment on a ground not presented in the motion. *See McConnell*, 858 S.W.2d at 341; *Mercier*, 214 S.W.3d at 774.

nor the Supreme Court of Texas have ever recognized that a person is privileged to intentionally interfere with an existing contract by proffering truthful information to a contract party.[29] PSC provides us no reason to recognize this defense to tortious interference with an existing contract, and we decline to do so here.

### 3. Summary

In sum, we conclude that the trial court erred in granting no-evidence summary judgment in favor of Jackson because appellant successfully raised an issue of material fact on all of the challenged elements of his claim. *See Hamilton*, 249 S.W.3d at 426; *Tamez*, 206 S.W.3d at 582. The trial court erred in granting traditional summary judgment because the motion did not address appellant's new cause of action for tortious interference. *See Nall*, 404 S.W.3d at 555; *Lehmann*, 39 S.W.3d at 200. The trial court erred in granting the no-evidence and traditional summary judgments in favor of PSC because PSC did not establish its entitlement to judgment as a matter of law. *See Hamilton*, 249 S.W.3d at 426; *Little*, 148 S.W.3d at 381.

### VI. CONCLUSION

We overrule appellant's second issue and affirm the no-evidence summary judgment for Jackson, the Hospital, and PSC on appellant's claims for business disparagement. We sustain appellant's first issue and reverse summary judgment for REAP on appellant's claim for breach of contract. We sustain appellant's third issue and reverse the traditional and no-evidence summary judgments rendered in favor of Jackson,

---

[29] Only the Fourteenth Court of Appeals has recognized this defense to a claim for tortious interference with an existing contract. *See Robles v. Consol. Graphics, Inc.*, 965 S.W.2d 552, 561 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (op. on reh'g) (citing RESTATEMENT (SECOND) OF TORTS § 772 (1979)). The court mentioned this defense again in *Financial Review Services, Inc. v. Prudential Insurance Company of America*, but the Supreme Court of Texas affirmed without mentioning it. 50 S.W.3d 495, 505 (Tex. App.—Houston [14th Dist.] 1998), *aff'd*, 29 S.W.3d 74 (Tex. 2000).

40

the Hospital, and PSC on appellant's claims for tortious interference with an existing contract. We remand this case to the trial court for further proceedings consistent with this opinion.

NORA L. LONGORIA
Justice

Delivered and filed the
6th day of November, 2014.